886 So.2d 915 (2004)
Curtis WINDOM, Appellant,
v.
STATE of Florida, Appellee.
Curtis Windom, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-2706, SC02-2142.
Supreme Court of Florida.
May 6, 2004.
Rehearing Denied as July 8, 2004.
*918 Jeffrey M. Hazen of Brody & Hazen, P.A., Registry Counsel, Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
Rehearing Denied as to SC01-2706 July 8, 2004.
PER CURIAM.
Curtis Windom appeals an order of the circuit court denying a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. Windom also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's order denying Windom's rule 3.850 motion, and we deny Windom's petition for a writ of habeas corpus.

BACKGROUND
The facts of this case, as set forth in this Court's direct appeal opinion, are as follows:
In her sentencing order, the trial judge set out the details of this tragic event, which occurred in the City of Winter Garden in west Orange County, Florida on February 7, 1992. Before the event was over, [Windom], armed with a gun, had murdered three people and seriously wounded a fourth. The pertinent facts taken from the trial record and stated in the trial judge's order are as follows:
Jack Luckett testified that he had talked with [Windom] the morning of the shootings. In their discussion, [Windom] asked Jack if Johnnie Lee had won money at the dog track and Jack said, "Yes, $114." [Windom] said Johnnie Lee owed him $2,000. When [Windom] learned Johnnie had won money at the track, he said to Jack, "My nigger, you're gonna to read about me." He further said that he was going to kill Johnnie Lee. That same day at 11:51 a.m. (per the sales slip and the sales clerk) [Windom] purchased a .38 caliber revolver and a box of fifty.38 caliber shells from Abner Yonce at Walmart in Ocoee. Mr. Yonce remembered the sale and recalled there was nothing unusual about [Windom] and that he was "calm as could be."
Within minutes of that purchase, [Windom] pulled up in his car next to where Johnnie Lee was standing talking to two females and Jack Luckett on the sidewalk. All three testified that [Windom's] car was close and [Windom] leaned across the passenger side of the vehicle and shot Johnnie Lee twice in the back. (Johnnie Lee's *919 back was towards [Windom] and there was no evidence that he saw [Windom].)... After the victim fell to the ground, [Windom] got out of the car, stood over the victim and shot him twice more from the front at very close range.... [Windom] then ran towards the apartment where Valerie Davis, his girlfriend and mother of one of his children, lived. ([Windom] lived with Valerie Davis off and on.) She was on the phone, and her friend Cassandra Hall had just arrived at the apartment and was present when [Windom] shot Valerie once in the left chest area within seconds of arriving in the apartment and with no provocation....
From the apartment, [Windom] went outside, encountered Kenneth Williams on the street, and shot him in the chest at very close range. Mr. Williams saw the gun but did not think [Windom] would shoot him. Right before he was shot, he turned slightly and deflected the bullet somewhat. Although he was in the hospital for about 30 days and the wound was serious, he did not die. He said [Windom] did not look normal  his eyes were "bugged out like he had clicked." ...
From there, [Windom] ended up behind Brown's Bar where three guys, including [Windom's] brother, were trying to take the weapon from him. By that time, Valerie's mother had learned that her daughter had been shot, so she had left work in her car and was driving down the street. [Windom] saw her stop at the stop sign, went over to the car where he said something to her and then fired at her, hitting her twice, and killing her.
Windom v. State, 656 So.2d 432, 435 (Fla.1995).
The jury convicted Windom of three counts of first-degree murder and one count of attempted first-degree murder, and unanimously recommended that Windom be sentenced to death. The trial court followed the jury's recommendation, finding two aggravating factors,[1] three statutory mitigating factors,[2] and four nonstatutory mitigating factors.[3]State v. Windom, No. CR 92-1305 (Fla. 9th Cir. Ct. order filed Nov. 10, 1992). Windom appealed his convictions and sentences to this Court, raising thirteen issues.[4] This *920 Court affirmed Windom's convictions and sentences. Although this Court found that the evidence was not sufficient to support the cold, calculated, and premeditated (CCP) aggravator with regard to the murders of Valerie Davis and Mary Lubin, it affirmed Windom's death sentences with respect to these two murders, finding that the existence of the one aggravating factor was sufficient to outweigh the little weight given to the mitigating factors found by the trial court. This Court denied Windom's remaining arguments. Windom thereafter filed a petition for writ of certiorari in the United States Supreme Court, which was denied. Windom v. Florida, 516 U.S. 1012, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995).
Windom thereafter filed an amended motion for post-conviction relief, raising twenty-one claims.[5] The post-conviction court held a Huff[6] hearing and summarily denied several of Windom's claims. The court granted an evidentiary hearing on *921 claims 2, 3, 4, 5, 6, 8, and 10. Following the evidentiary hearing, the post-conviction court entered a final order denying all relief. State v. Windom, No. CR92-1305 (Fla. 9th Cir. Ct. order filed Nov. 1, 2001) (post-conviction order). Windom now appeals the post-conviction court's denial of his rule 3.850 motion. He also petitions this Court for a writ of habeas corpus.

RULE 3.850 APPEAL
Windom's rule 3.850 appeal asserts that (1) his trial counsel was ineffective for failing to present an insanity defense during the guilt phase of the trial; (2) his trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase of the trial; (3) his trial counsel affirmatively harmed his case by making damaging statements to the court and conceding the State's case; and (4) the post-conviction court erred in summarily denying his remaining post-conviction claims.

Issue 1: Ineffective Assistance of Guilt-Phase Counsel
To prove a claim of ineffective assistance of counsel:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown of the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
This Court reviews a post-conviction court's Strickland analysis as follows:
[T]he performance and prejudice prongs are mixed questions of law and fact subject to a de novo review standard but ... the trial court's factual findings are to be given deference. See Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999). So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. Id. We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact.
Porter v. State, 788 So.2d 917, 923 (Fla.2001).
Windom argues that his trial counsel, Ed Leinster, was ineffective for failing to investigate and present evidence during the guilt phase of the trial that Windom was insane at the time of the shootings and that he shot the last victim, Mary Lubin, in self-defense. After holding an evidentiary hearing on this issue, the post-conviction court denied this claim, providing over twenty pages of analysis in its order.

A. Failure to Investigate Mental Health Experts
Windom's first claim of ineffective assistance of guilt-phase counsel contends that his trial counsel was ineffective for failing to present expert testimony to support an insanity defense. At the evidentiary hearing, Windom presented the testimony of Dr. Jonathan Pincus, Dr. Craig Beaver, and Dr. Robert Kirkland. The State presented the testimony of Dr. Sidney Merin. Dr. Pincus, a neurologist, concluded that Windom was psychotic at the time of the shootings and that Windom suffers from *922 brain damage to the frontal lobe of his brain. Dr. Beaver, a licensed psychologist and clinical neurologist, testified that Windom experienced an acute psychotic episode when he shot the victims. Although he could not reach a specific diagnosis, Dr. Beaver stated that Windom's psychosis was probably caused by bipolar disorder in a psychotic manic phase, depressive disorder with a mood congruent psychotic feature, or schizophrenia paranoid type.
Dr. Robert Kirkland, a psychiatrist, testified that he evaluated Windom at the time of the trial to determine whether Windom was competent to stand trial and his mental condition at the time of the crimes. He stated that he was not given sufficient information to determine whether Windom was sane at the time he committed the crimes, but there was no indication that Windom had brain damage. Finally, Dr. Sidney Merin, a clinical and neuropsychologist, testified that Windom was not insane at the time of the shootings and that Windom did not have brain damage.
In its detailed order denying relief, the post-conviction court discussed and weighed the expert testimony presented. With regard to the deficient performance prong of the Strickland analysis, the post-conviction court stated:
A strategic or tactical decision is not a valid basis for an ineffective claim unless a defendant is able to show that no competent trial counsel would have utilized the tactics employed by trial counsel. See White v. State, 729 So.2d 909 at 912 [Fla. 1999] (citing Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir.1998)). Mr. Leinster clearly faced a dilemma in this matter. He could attempt to introduce mental health testimony suggesting that Mr. Windom was not of sound mind and that he was unable to formulate criminal intent. However, knowing of Mr. Windom's past, Mr. Leinster knew that the introduction of this evidence would open the door to Mr. Windom's activities as a successful drug dealer in his community and what prosecutor Jeff Ashton described as "operation cookie monster." Mr. Ashton testified that "operation cookie monster" was a large scale drug investigation that was going on in Mr. Windom's community at the time of the murders. In this investigation, Mr. Ashton learned about possible motives for two of the murders, and the fact that the victims were cooperating with authorities in this drug investigation. Additionally, Mr. Ashton testified that he made this clear to Mr. Leinster, along with the fact that he was anxious to put this information into evidence should Mr. Leinster put on mitigation.
This evidence would have been extremely detrimental to Mr. Windom's interests. The jury would have certainly thought less of Mr. Windom as a person if they knew he was a drug dealer. Additionally, the evidence that Mr. Windom was a drug dealer would have provided a more sensible motive for his shootings. Mr. Ashton's memorandum, prepared ten days after Mr. Windom's arrest, indicated that some or all of Mr. Windom's victims were police informants. In both deposition and mitigation hearing testimony, witness Mary Jackson testified that Mr. Windom was concerned that Valerie Davis was about to inform on him. The record on appeal supports Mr. Ashton's testimony that Mr. Windom was involved in large scale drug sales. Mr. Windom and his girlfriends were in possession of large amounts of money at any given time. He and Valerie Davis bought a car for $8,500 in cash. His sister Gloria was able to come up with $15,000 in cash to engage Mr. Leinster. Further, Mr. *923 Windom had $10,000 in cash in a safe located at the apartment of another girlfriend, Julie Harp. This safe was apparently stolen by someone before the murders. These are fairly staggering amounts of money considering the uncontradicted fact that Mr. Windom had never been gainfully employed. The state argues that such large amounts of money obviously could be the source of serious disagreements between Mr. Windom and his fellow drug dealers.
If the jury had heard this evidence, Mr. Leinster would have been unable to present the shootings as senseless acts committed by a person in an altered mental state. The record is clear that Mr. Leinster attempted to buttress his argument that defendant was in an altered mental state at the time of the murders by Dr. Kirkland's testimony. Dr. Kirkland suggested the possibility that Mr. Windom might have been suffering from a fugue state at the time of the murders, but it did not include or rely on Mr. Windom's background history. Mr. Leinster attempted to limit Dr. Kirkland's testimony so as to allow him to attack the intent element of the crimes without opening the door to evidence of Mr. Windom's bad character, and potential motives for committing the murders. The record shows that this was Mr. Leinster's strategy throughout the guilt phase trial. Mr. Leinster emphasized in both the opening statement and in closing argument that the shootings were "a senseless act of violence" and that the jury should determine from the acts themselves, the inherent bizarreness of the acts.
Post-conviction order at 11-13 (record citations omitted).
Windom contends that the post-conviction court erred in finding Leinster's strategy reasonable because Leinster did not have a tactical reason for not presenting evidence that Windom was insane. Windom claims that Leinster simply did not investigate this evidence and did not know it was available. We reject this argument. The post-conviction court's findings of fact are supported by competent, substantial evidence. These findings of fact indicate that Leinster's strategy to prevent the State from introducing damaging evidence of Windom's motive for shooting the victims was reasonable. Trial counsel is not deficient for failing to present additional testimony that would have informed the jury of negative information about the defendant. Breedlove v. State, 692 So.2d 874, 878 (Fla.1997).
With regard to the prejudice prong of the Strickland analysis, the post-conviction court stated:
Mr. Windom has not met his burden to show a reasonable probability that the strategy he now claims Mr. Leinster should have employed regarding guilt phase mental health experts would have produced a different outcome at the guilt phase trial. It is clear that Mr. Leinster acted as he did to prevent the introduction of evidence about Mr. Windom's criminal drug activities, along with his potential motive to kill certain victims for being informers. Had he introduced such evidence, prosecutor Ashton would have had the platform he needed to build a different model of Mr. Windom. The notions suggested now by the collateral counsel, that Mr. Windom was a simple, humble man who was mentally incompetent and unaware of the nature and consequences of his actions, would have been countered with the state's evidence showing that Mr. Windom was a remorseless killer bent on revenge for those who informed on him for illicit drug activities.
*924 Post-conviction order at 14. Moreover, the court further stated that while the testimony of the experts presented by Windom were authoritative, their opinions were based on facts not entirely supported by the evidence. Post-conviction order at 15. The court concluded that the evidence surrounding the shootings presented at trial directly negated the experts' opinions at the evidentiary hearing. The court reasoned:
Dr. Pincus testified that Mr. Windom did not have any plan to do what he did, and that he simply took a gun, shot his best friend, shot at somebody in the street that he happened to casually meet, killed his girlfriend, and then shot her mother, all in the mistaken belief that they were after him, or that there was some kind of conspiracy. He further testified that the killings were a series of chance encounters. However, the evidentiary hearing evidence and trial record suggests that the first three persons were shot over drug money and in revenge for Mr. Windom's belief that these people were police informers.
At least an hour before he shot Johnnie Lee, Mr. Windom told Jack Luckett that he was angry with Mr. Lee because Mr. Lee owed him money for another reason. Mr. Windom told Mr. Luckett that he was going to kill Mr. Lee, and that Mr. Luckett would read about him in the paper. A few minutes later Mr. Windom went to a local Wal Mart, and cooly bought the ammunition used to shoot Mr. Lee and the other victims. Within minutes of the ammunition purchase, Mr. Windom drove up to Mr. Lee, who was standing with his back to Mr. Windom, talking to friends. Mr. Windom stopped, aimed out of his car window, and shot Mr. Lee twice in the back. He then got out and shot the prone, motionless victim again and walked off. Witness [Pamela] Fikes, who was talking to Mr. Lee just before his murder recalled that just before Mr. Windom fired the first shot, he said, "my mother-fucking money, nigger?" This comment precisely matched the reason Mr. Windom had given earlier that day for planing to kill Mr. Lee.
....
With respect to the shooting of Mary Lubin, Dr. Pincus expressed a view of the facts which conflicted with the testimony given at the hearing by defense witness Eddie James Windom. Dr. Pincus proposed that defendant shot Mary Lubin as part of a series of chance encounters. However, Eddie James Windom stated that when he saw Ms. Lubin drive up, he jumped into the bushes in such a hurry that he did not even see whether Ms. Lubin had a gun. Eddie James Windom logically concluded that either Mary Lubin or Mr. Windom was going to start shooting, and he fled for his own safety. When directly asked about this, Dr. Pincus conceded that Mr. Windom's apprehension that Mary Lubin might have been armed was founded in logic and was not a paranoid delusion.
....
While I found both Dr. Pincus and Dr. Beaver to be bright, articulate, and authoritative witnesses, their conclusions were drawn from facts not supported by the evidence.... While there is a wealth of evidence to suggest that Mr. Windom suffered from low IQ, depression, and a bipolar disorder, there is virtually no evidence to suggest that Mr. Windom had any trouble functioning prior to the date of these murders. Virtually no medical records existed to verify either of the head injuries now claimed by Mr. Windom. Mr. Windom's family says that after his vehicle injury at the age of 16, he became more paranoid and failed to interact much with anybody. This *925 appears to be part of what the doctors based their conclusions upon. Yet in the evidentiary hearing, Mr. Windom's family testified that prior to this event, he was well-groomed, affable, and took pride in his appearance. One story seems to contradict the other.
....
... I agree with the state that the doctors did not have a grasp of the violent social setting within which Mr. Windom lived at about the time the shooting occurred. Neither doctor knew of the fact that Mr. Windom's drug partner, Kenny Thames, was tortured and murdered within months of Mr. Windom's murders. The doctors never conversed with Mr. Leinster about Mr. Windom's lifestyle prior to these murders. With additional information, such as Mr. Ashton's testimony about "operation cookie monster," they might have believed that Mr. Windom's "edgy" demeanor was more likely a realistic assessment of the setting in which he lived, rather than a product of irrational paranoia or delusion.
Both doctors seemed to have ignored Mr. Windom's own statements on the day of the murders, which would seem to belie Dr. Pincus' conclusions that these murders were merely a series of chance encounters with Mr. Windom acting out of momentary impulse. As previously noted, Mr. Windom suggested to one witness to be sure and read the papers the next day because his name would be in it. He was correct. The totality of the circumstances surrounding these events suggest to me in no uncertain terms that Mr. Windom's actions were knowing and premeditated.... Perhaps with additional medical testimony, well prepared, Mr. Leinster could have done more to obfuscate the facts by presenting the mitigation of brain damage. Given the other facts which could have and would have surfaced, however, I doubt it.
The testimony of Dr. Sydney Merin seemed more logically based and consistent with the facts. He did not find that Mr. Windom was suffering from a mental impairment which would have supported an insanity defense for his acts on the day of the shootings. He did feel that Mr. Windom had a personality disorder and that some of his low sub-test results were the product of the fact that he suffered from a learning disorder....
There is no reasonable probability that the guilt phase would have resulted in a different outcome if experts such as Dr. Pincus and Dr. Beaver had been prepared and called by Mr. Leinster. Their conclusions seem contrived, and were based upon speculation about Mr. Windom's state of mind on the day of the shooting. Their conclusions ignored much of the trial record evidence of Mr. Windom's statements on the day of the shootings which indicated that he knew what he was doing and had motives for his shooting the victims.
Post-conviction order at 15-20 (reference citations omitted).
As the foregoing demonstrates, the post-conviction court extensively weighed the evidence presented at the evidentiary hearing and concluded that the experts' testimony that Windom was insane at the time of the shootings was contradicted by the circumstances surrounding the shooting and the evidence presented both at the evidentiary hearing and at trial. These findings are supported by competent, substantial evidence and show that even had Leinster presented evidence of mental deficiency, there is no reasonable probability that the outcome of the trial would have been different. Such evidence would have *926 been undermined by the State's damaging and directly contradictory evidence that Windom was more than capable of functioning as a normal person. See Spencer v. State, 842 So.2d 52, 62 (Fla.2003) (finding that trial counsel was not ineffective for making a strategic decision not to present evidence relating to defendant's guilt because such evidence would have opened the door to damaging and prejudicial evidence). We therefore affirm the post-conviction court's denial of Windom's claim of ineffectiveness with regard to this issue.

B. Failure to Investigate Fact Witnesses
Windom contends that his trial counsel was ineffective for failing to present fact witnesses during the guilt phase of the trial that would have shown a marked change in Windom's behavior in the weeks preceding the shootings, which would have supported his assertion that he was insane at the time of the crime. At the evidentiary hearing, Windom presented the testimony of five family members, a childhood friend, and a neighbor. These witnesses testified generally as to Windom's poor childhood and upbringing, and his demeanor in the weeks prior to the shootings. They testified that Windom, who had always been well groomed and neatly dressed, had become disheveled. He began walking around in public with no shirt or shoes, or wearing the same clothes for days at a time. They further stated that Windom had not bathed and that he had an odor. Windom's mother and sister testified that Windom had suffered two brain injuries as a child.
The post-conviction court denied this claim, finding that the lay witness testimony would likely not have changed the outcome of the trial because Windom's trial counsel did in fact present evidence of Windom's demeanor at the time of the crime during the guilt phase. Trial counsel presented testimony that Windom looked wild on the day of the shootings and completely out of character. The jury heard testimony that Windom had been upset in the days leading up to the shootings and that Windom had never been a violent person.
With regard to evidence of brain damage from head injuries Windom suffered as a child, the post-conviction court found:
The central theme to Mr. Windom's attack in this matter centers around Mr. Leinster's lack of investigation into Mr. Windom's mental health, and whether he suffered brain damage from two events described during the hearing. The most notable event described was Mr. Windom's "rollover" traffic accident wherein Mr. Windom alleges he lost consciousness and was hospitalized for a couple of days. Indeed, the defense's medical experts (Pincus and Beaver) draw a great deal of their conclusions based upon what they felt was one undeniable aspect of [Windom's] past: that he suffered permanent brain damage from the traffic accident Mr. Windom described. While Mr. Barch was somewhat unsure of the doctor's name, he did remember speaking to him before the trial, and posing the question to him regarding whether Mr. Windom had sustained any brain damage as a result of his traffic accident. The doctor (who Mr. Barch seemed to think was named Khouzoum) apparently stated unequivocally to Mr. Barch that Mr. Windom suffered no lasting damage from this accident.
Additionally, Mr. Barch specifically asked Mr. Windom's mother and sister about any incident in his life which may have caused brain damage. They provided no information to Mr. Barch about any other head injuries including birth trauma.
*927 Post-conviction order at 5-6 (record citations omitted).
The post-conviction court's findings of fact are supported by competent, substantial evidence. We find no legal error in the post-conviction court's denial of relief on this issue.

C. Trial Counsel's Substance Abuse
Windom argues that trial counsel Ed Leinster was ineffective at trial because he was intoxicated. At the evidentiary hearing, Windom presented the testimony of three lay witnesses who stated that they smelled alcohol on Leinster's breath during the trial. The State, in turn, presented the testimony of Judge Dorothy Russell, the trial judge who presided over Windom's trial; Jeff Ashton, who prosecuted Windom's case; Janna Brennan, who assisted Ashton at trial; and Kurt Barch, who assisted Leinster at trial. These witnesses testified that they had extremely close contact with Leinster throughout the trial and did not smell alcohol on his breath or believe that he was intoxicated. Each of these witnesses further testified that Leinster vigorously and consistently defended Windom's case and exhibited no signs of alcohol abuse.
The post-conviction court weighed the testimony of these witnesses and concluded that there was no record evidence to support Windom's allegation that Leinster was intoxicated during the trial. Post-conviction order at 21.
During the hearing, some evidence was presented by Mr. Windom's relatives that Mr. Leinster smelled of alcohol during the trial. However, Mr. Barch, the presiding judge, and both prosecutors testified that they saw absolutely no evidence of alcohol use or abuse. Further, they each alleged that, based upon Mr. Leinster's reputation (he had several alcohol and drug related arrests), they were looking for any signs of impairment. On this issue, I accept their testimony over that of Mr. Windom's relatives.
Post-conviction order at 8.
This Court has held that it will not substitute its judgment for that of the trial court on questions of fact, and likewise on the credibility of witnesses and the weight given to the evidence so long as the trial court's findings are supported by competent, substantial evidence. Porter v. State, 788 So.2d 917, 923 (Fla.2001). The post-conviction court's findings with regard to this issue are supported by competent, substantial evidence. Based on these factual findings, we find no legal error in the post-conviction court's denial of this claim.

D. Denial of Right to Competent Medical Assistance
Windom argues that Leinster's failure to investigate and present evidence regarding Windom's mental state denied him his right to competent assistance by a mental health expert. The post-conviction court denied this claim, explaining that it harbored grave reservations about whether Windom ever suffered any sort of meaningful head injury prior to the murders.
Even though [Dr. Pincus and Dr. Beaver] had an opportunity to review a far more extensive background record than did Dr. Kirkland, I cannot accept their opinions. Specifically, Mr. Windom's conduct on the day of the murders refutes rather than supports their opinions that his acts were the product of brain damage or delusion.
Post-conviction order at 31. Dr. Kirkland further testified that Windom showed no significant signs of brain damage.
The trial court's findings of fact and weight given to the evidence is supported by competent, substantial evidence. Based on these findings, Windom has *928 failed to demonstrate that his defense was "devastated by the absence of a psychiatric examination and testimony [and that] with such assistance, the defendant might have [had] a reasonable chance of success." Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

Issue 2: Ineffective Assistance of Penalty-Phase Counsel
Windom argues that his trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase of the trial. This argument is based upon the same evidence Windom presented at the evidentiary hearing in support of his claim of insanity discussed above. Specifically, Windom argues that the mental health experts' testimony at the evidentiary hearing regarding Windom's mental health should have been presented at the penalty phase. Windom also presented the testimony of his family members, who discussed Windom's poor upbringing, his childhood bladder control problem, and two head injuries he sustained as a child.
In its detailed order, the post-conviction court denied this claim for reasons similar to its denial of Windom's guilt-phase ineffectiveness claim. The court found that counsel was not deficient in failing to present this evidence before the jury because the evidence that would have been presented in rebuttal greatly outweighed any value of the mental health expert and lay witness testimony. We find that the post-conviction court's findings of fact are supported by competent, substantial evidence. Prosecutor Jeff Ashton testified at the evidentiary hearing regarding the rebuttal evidence that he would have introduced had defense counsel presented its intended mitigation evidence. This rebuttal evidence would have directly countered any assertion of brain damage by showing that Windom was capable of running a successful drug enterprise and that his everyday functioning was not impaired. The record supports the post-conviction court's conclusion that Leinster's strategy to prevent the jury from hearing such damaging evidence was reasonable. See Gaskin v. State, 822 So.2d 1243, 1248 (Fla.2002) ("Trial counsel will not be held to be deficient when she makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony."); Medina v. State, 573 So.2d 293, 298 (Fla.1990) (holding that trial counsel was not ineffective for failing to investigate and present evidence that would have presented the defendant in an unfavorable light).
Windom further contends that his trial counsel was ineffective for causing Windom to involuntarily waive his right to present mitigating evidence before the jury. Prior to the penalty phase, trial counsel Kurt Barch announced the witnesses that the defense intended to present in mitigation. Upon the conclusion of the State's presentation at the penalty phase, however, Kurt Barch and Ed Leinster did not believe that Windom should present his mitigation witnesses before the jury because to do so would open the door to damaging evidence of Windom's involvement in drugs. Windom therefore waived his right to present mitigating evidence before the jury, and his trial counsel instead presented such evidence before the trial judge alone.
Windom now contends that his waiver of the presentation of mitigating evidence before the jury was involuntary because he was not aware of what could have been presented. The post-conviction court found that Windom failed to prove this claim at the evidentiary hearing. We agree. Before a defendant may waive his right to present mitigating evidence, counsel must first investigate all avenues and *929 advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision. State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). The record in this case reveals that Windom's waiver was knowing, intelligent, and voluntary. At the time Windom waived his right to present mitigating evidence before the jury, the trial court, trial counsel Leinster, and prosecutor Ashton questioned Windom with respect to the voluntariness of this decision. The record indicates that Windom was indeed aware of the evidence that could have been presented before the jury and voluntarily waived his right to present it. We therefore affirm the post-conviction court's denial of this claim.

Issue 3: Trial Counsel's Comments to the Jury During Closing Argument of the Penalty Phase
Windom argues that trial counsel Ed Leinster conceded the State's case at the penalty phase of trial by pointing out that he was unsuccessful at the guilt phase, that Windom does not deserve pity for what he did, and that Windom's actions were cold. The post-conviction court found that Windom was not prejudiced by Leinster's remarks.
Mr. Windom had already been convicted of first-degree premeditated murder, and counsel was attempting to restore credibility with the jury in order to make an argument for saving his client's life. There was no harm in conceding the validity of the jury's verdict during the penalty phase, and it was reasonable trial strategy for Mr. Leinster to be realistic about the facts of the case in order to restore a measure of credibility to the defense as it moved into the penalty phase.
... [T]he apparent concession that Mr. Windom deserved the death penalty was not a concession at all. Mr. Leinster's comments conceding that Mr. Windom deserved the death penalty and conceding the existence of the CCP aggravator are taken entirely out of context. Mr. Windom had already been convicted of first-degree premeditated murder, and Mr. Leinster was faced with a daunting task. As he stated matter-of-factly, "My job is to try to save a man's life, end of story." It would have strained his credibility, thereby contributing to the difficulty of his task, to argue the verdict was unjust to the same jury which would be imposing a sentence. It was a reasonable trial strategy for Mr. Leinster to be realistic about the facts of the case in order to restore a measure of credibility to the defense. The record also demonstrates that he argued vigorously against the death penalty in general and argued that executing Mr. Windom would just be another act of murder.
Post-conviction order at 33.
The post-conviction court's conclusions with regard to Leinster's comments at the penalty phase are supported by the record. At the evidentiary hearing, Leinster and Barch made clear that their strategy was to convey that Windom was not acting like himself that day and that he did not deserve the death penalty. Leinster stated that he did not want to lose credibility with the jury by speaking in terms of innocence since the jury had just found Windom guilty. We find no legal error in the post-conviction court's decision and therefore affirm the court's denial of this claim.

Issue 4: The Trial Court's Summary Denial of Windom's Claims
Windom argues that the post-conviction court erred in summarily denying the following claims: (1) Windom is innocent *930 of first-degree murder and innocent of the death penalty because the jury was given unconstitutionally vague instructions with regard to the CCP aggravating factor and because Windom's death sentences are disproportionate; (2) Windom's death sentences are unconstitutional because the penalty-phase jury instructions improperly shifted the burden of proof to Windom; (3) Windom's death sentences are premised on fundamental error because the jury was not given adequate guidance with regard to the CCP aggravating factor; (4) Windom's death sentences are predicated upon an automatic aggravating circumstance because Windom's jury was instructed that it could find the prior violent felony aggravator based on his contemporaneous convictions; and (5) Windom's constitutional rights were violated by the rules prohibiting Windom's lawyers from interviewing jurors to determine if constitutional error existed with respect to their verdict.
We find no error in the post-conviction court's summary denial of these claims. All of these claims are procedurally barred because they either were raised and rejected on direct appeal or could have been raised on direct appeal. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) (stating that issues that could have been but were not raised on direct appeal or issues that were raised and rejected on direct appeal are not cognizable through collateral attack).

PETITION FOR WRIT OF HABEAS CORPUS
In his petition for writ of habeas corpus, Windom asserts: (1) Windom's death sentence is unconstitutional based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (2) Windom's death sentence is rendered invalid because necessary elements of the offense were not charged in the indictment; and (3) appellate counsel was ineffective for failing to assert fundamental error on direct appeal with regard to improper statements made by the prosecutor at trial.

Habeas Issues 1 and 2: Validity of Windom's Death Sentence
Windom asserts that his death sentence is unconstitutional in light of the United States Supreme Court's decisions in Ring v. Arizona and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court considered similar claims and denied post-conviction relief in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002); and Porter v. Crosby, 840 So.2d 981 (Fla.2003). Moreover, the jury in this case recommended that Windom be sentenced to death by a unanimous vote, and one of the aggravating circumstances found by the trial judge was that Windom had been convicted of a prior violent felony. We deny relief in this case.

Habeas Issue 3: Appellate Counsel's Ineffectiveness
Windom argues that appellate counsel was ineffective for failing to assert fundamental error with respect to instances during which the jury was permitted to hear improper prosecutorial arguments. When evaluating an ineffective assistance of appellate counsel claim raised in a writ of habeas corpus, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine *931 confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). The defendant must allege a specific, serious omission or overt act upon which the claim of ineffective assistance can be based. Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Fundamental error is error that "reaches down into the validity of the trial itself to the extent that the verdict of guilty could not have been obtained without the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla.1996). Windom's appellate counsel was not ineffective for failing to assert fundamental error with regard to the prosecutor's statements during trial. The record does not support Windom's contentions that the prosecutor's comments were improper. Appellate counsel is not ineffective for failing to raise nonmeritorious claims. Moore v. State, 820 So.2d 199, 209 (Fla.2002). We therefore deny this claim.

CONCLUSION
Accordingly, we affirm the post-conviction court's denial of Windom's rule 3.850 motion and deny Windom's petition for writ of habeas corpus.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., concurs with an opinion, in which CANTERO and BELL, JJ., concur.
PARIENTE, J., concurs specially with an opinion.
CANTERO, J., concurs specially with an opinion, in which WELLS and BELL, JJ., concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
WELLS, J., concurring.
I fully concur in the majority opinion.
I do join in Justice Cantero's excellent opinion on the retroactivity of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and on Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Justice Cantero has done great service with this work. I point out that my joining in Justice Cantero's opinion is not a variance from the views that I have expressed in Bottoson, King, and Duest v. State, 855 So.2d 33 (Fla.2003), cert. denied, No. 03-8841, ___ U.S. ___, 124 S.Ct. 2023, 158 L.Ed.2d 500 (U.S. 2004), that Florida courts are to continue to follow the United States Supreme Court's precedent expressly approving the constitutionality of Florida's capital sentencing statute. In initial proceedings, trial courts are to continue to apply the capital sentencing statute, which has now been in effect for twenty-nine years. I join Justice Cantero's opinion because I agree with his opinion that retroactivity is a threshold issue and recognizing that Ring is not retroactive will serve to reduce the presentation and argument of other issues related to Ring in post-conviction proceedings in this Court and in the trial courts.[7]
I further agree with Justice Cantero that the adoption of the Teague analysis for retroactivity in post-conviction collateral proceedings would serve the interests of the proper administration of justice in Florida.
CANTERO and BELL, JJ., concur.
PARIENTE, J., specially concurring.
I concur in the majority opinion, and write separately in response to Justice *932 Cantero's specially concurring opinion to explain why I would not address the retroactivity of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in this case. First, I believe that deciding the issue now is unnecessary in light of our consistent rejection of Ring claims. Second, deciding retroactivity is premature because we have not determined whether Ring has any applicability to Florida's capital sentencing scheme, and a proper retroactivity analysis would need to take into account the substance of any new principle of law. Third, and related to the second point, this Court has never before decided retroactivity before deciding the applicable principle of law, and there is no sound reason for taking this step in this case when there is another basis for denial. Fourth, deciding retroactivity will not save us judicial labor because the issue of retroactivity is also pending before the United States Supreme Court. Lastly, since we can decide this case on other grounds without deciding retroactivity, this appears to me to be an inappropriate case in which to reconsider our precedent of Witt v. State, 387 So.2d 922 (Fla.1980). I address each of these points in turn.
First, because a majority of this Court has been able to dispose of post-conviction Ring claims on other grounds, there is no need to decide retroactivity now. In every post-conviction appeal in which a Ring claim has been raised and discussed, this Court has determined on the merits that Ring did not warrant reversal of the defendant's sentence of death. This very case serves as an example of a consensus on Ring claims. Six of us have concurred in the majority opinion's rejection of Windom's Ring claim in reliance not only on the decisions in Bottoson and King but also on the prior violent felony aggravator and the unanimous death recommendation. See majority op. at 930.
Majority decisions of this Court in other cases reflect the same or a similar consensus. See Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (holding that "prior violent conviction [aggravator] alone" satisfies the mandate of Ring), cert. denied, ___ U.S. ___, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004); Anderson v. State, 863 So.2d 169, 189 (Fla.2003) (relying in part on unanimous death recommendation and prior violent felony conviction to reject Ring claim), cert. denied, ___ U.S. ___, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004); Belcher v. State, 851 So.2d 678, 685 (Fla.) (concluding that aggravators of prior violent felony conviction and murder in the course a felony supported by separate guilty verdict exempt sentence from holding in Ring, cert. denied, 540 U.S. 1054, 124 S.Ct. 816, 157 L.Ed.2d 706 (2003)). Whether one concludes that Ring has no application in Florida and that an other-conviction aggravator is a supplemental basis to deny relief under Ring,[8] or that Ring applies and that an other-conviction aggravator is the sole reason for denial of relief under Ring in the absence of a unanimous death recommendation,[9] the fact remains that this Court has reached a consensus that has resulted in the denial of Ring relief in the vast majority of cases.[10] Because a *933 majority of the members of this Court appears to have reached a bottom-line determination that has resulted in the denial of Ring claims without reliance on the decisions in Bottoson and King, I conclude that at this point, we need not take the next step and determine whether Ring applies to cases in which the sentence of death is final.
Second, we should not address retroactivity until and unless any part of Florida's death penalty scheme is declared unconstitutional. Deciding retroactivity before applicability would be putting the proverbial cart before the horse. This is because under Witt an essential consideration in determining retroactivity is whether the decision is of fundamental significance. See Witt, 387 So.2d at 931.[11] We explained:
The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice.
Id. at 925. A determination that the standard jury instruction that informs the jury that its role is only advisory may be erroneous under Ring but might not trigger retroactivity. On the other hand, a determination that a defendant has been denied the Sixth Amendment right to a unanimous determination of an aggravating factor might trigger application of the Witt factors, especially in light of the repeated recognition that death is different. Thus, too many questions that would critically affect the retroactivity analysis remain unanswered at this point.
Third, this Court has never before decided retroactivity as a threshold matter before deciding the merits of the substantive issue. To do so now when it is unnecessary to reach the issue in this case would not be sound precedent because the nature of the new principle of law and the issue of whether that principle should be given retroactive effect are interrelated. In short, we cannot determine whether Ring constitutes a "development of fundamental significance," Witt, 387 So.2d at 931, until we have ascertained its effect, if any, on Florida's capital sentencing scheme. In other situations in which we have addressed retroactivity of a new rule of law, we knew precisely what rule of law we were applying. See, e.g., State v. Stevens, 714 So.2d 347, 348 (Fla.1998) (holding that decision limiting sentence enhancement for attempted murder of a law enforcement officer to attempted first-degree murder was *934 retroactive); State v. Woodley, 695 So.2d 297, 298 (Fla.1997) (determining that decision holding that attempted felony murder was a nonexistent crime was not retroactive). In contrast, because we cannot yet ascertain the effect of Ring in Florida, we cannot yet reliably determine retroactivity. If and when either this Court or the United States Supreme Court determines in a specific case that Ring has invalidated a Florida death sentence in some respect, it is that decision's retroactivity that will be in issue, not Ring itself, which did not directly apply to the Florida death scheme.
Further, there is scant precedent in the decisions of other courts for determining the retroactivity of a new rule of law before deciding whether the rule would apply in a particular case. Justice Cantero cites to Turner v. Crosby, 339 F.3d 1247 (11th Cir.2003), cert. denied, No. 03-9251, ___ U.S. ___, 124 S.Ct. 2104, 158 L.Ed.2d 718 (U.S. 2004), as a case in which the court decided that Ring was not retroactive without determining whether it applied to Florida's death scheme. See specially concurring op. at 939. However, the Eleventh Circuit in Turner decided nonretroactivity as an alternative to its holding that the claim was procedurally barred when presented initially in a federal habeas petition, arguably making the discussion of retroactivity dicta. See 339 F.3d at 1282 ("Alternatively, if Turner is not procedurally barred from bringing a Ring claim, Ring does not apply retroactively to Turner's § 2254 petition in any event.").[12]
Fourth, a decision by this Court that Ring is not retroactive will not promote greater judicial efficiency. The issue of the retroactivity of Ring is presently pending review in the United States Supreme Court. See Summerlin v. Stewart, 341 F.3d 1082 (9th Cir.), cert. granted in part sub nom. Schriro v. Summerlin, 540 U.S. 1045, 124 S.Ct. 833, 157 L.Ed.2d 692 (2003). While Summerlin is pending, defendants will continue to raise the issue at the state level to preserve it for eventual federal review.[13] In his specially concurring opinion, Justice Cantero suggests that deciding retroactivity now will clarify the Court's position to the growing number of appellants who have argued that this Court has already decided that Ring applies retroactively. The fact that some defendants have made this assertion incorrectly should not press us into deciding retroactivity prematurely.
Finally, and for some of the same reasons discussed above, I do not consider this the appropriate case in which to reconsider our decision in Witt. Although I am not averse to revisiting the proper retroactivity standard in applying precedent from the United States Supreme Court, I think it prudent to await a case in which retroactive application would require either that a conviction be reversed or a sentence vacated. Because a majority *935 of this Court would deny Ring relief to Windom even if we were to conclude that Ring applies retroactively, this is not the proper case to revisit Witt.
In conclusion, I believe that because of the uncertainties in the law created by Ring and yet to be resolved in this State, we would be acting unnecessarily, prematurely, and with no significant conservation of judicial resources in determining at this point whether Ring is retroactive.
CANTERO, J., specially concurring.
I concur in the majority's opinion. I write separately because the appellant, like many others before him (and many others that will follow), argues that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), renders unconstitutional Florida's death penalty sentencing scheme. I believe we should finally decide the question of whether, even if Ring did apply in Florida (members of this Court disagree on whether it does, and under what circumstances), it would apply retroactively. I would hold that it does not.
I also write separately because I believe that we should answer questions about the retroactivity of decisions of the United States Supreme Court based on that Court's own standards, as articulated in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and not based on the now-outmoded test we announced in Witt v. State, 387 So.2d 922, 925 (Fla.1980).
I discuss below (I) the history of Ring and our discussions about whether it applies in Florida; and (II) whether Ring should apply retroactively, by (A) explaining the different standards for determining retroactivity, and then analyzing the retroactivity of Ring under (B) the Teague standard or (C) the Witt standard.

I. Lord of the Ring: The Supreme Court's Decision and Our Cases Interpreting It
I begin by analyzing the decision in Ring and our subsequent interpretations. In June 2002, the United States Supreme Court decided Ring v. Arizona, in which it held that a jury, not a judge, must determine facts relevant to whether the death penalty is the appropriate punishment. This decision affected the death penalty law of many states. All states where, in capital cases, a judge was partially or totally responsible for the sentencing decision had to determine whether and under what circumstances Ring applied and whether it required anywhere from a slight change to a total revamping of the sentencing process. In this Court, no majority view has emerged. We have not considered, however, whether, if Ring did apply, it would apply retroactively. In my view, this is a threshold issue that should precede any discussion of Ring's applicability.

A. The Fellowship of the Ring: The Supreme Court's Decisions in Apprendi and Ring

The Supreme Court's decision in Ring merely applied another case, Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), decided two years earlier, to death penalty cases. Therefore, to understand Ring and its holding, we must first analyze Apprendi. The defendant in Apprendi was charged with possession of a firearm for an unlawful purpose, which under New Jersey law carried a maximum sentence of ten years' imprisonment. 530 U.S. at 468-70, 120 S.Ct. 2348. The trial court also found, however, that the defendant committed the offense while motivated by racial bias. The judge therefore imposed an enhanced eighteen-year sentence under the state's "hate *936 crime" statute. The issue in the case was "whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." Id. at 469, 120 S.Ct. 2348. The Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.
Two years after Apprendi, the Supreme Court decided Ring, which applied Apprendi to death penalty cases. Although the Court in Apprendi had excluded death penalty cases from its holding, 530 U.S. at 497, 120 S.Ct. 2348, in Ring it retreated from that position. The Court instead stated that under the Sixth Amendment right to a jury trial, "[c]apital defendants, no less than noncapital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589, 122 S.Ct. 2428.

B. The Two Towers: Our Decisions in Bottoson and King Considering Whether Ring v. Arizona Applies in Florida
We first analyzed the effect of Ring on Florida law in two cases decided four months after Ring. See Bottoson v. Moore, 833 So.2d 693, 695 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). Neither case commanded a majority, however. In Bottoson, three justices joined the per curiam opinion denying relief. That opinion noted that the United States Supreme Court has repeatedly upheld Florida's capital sentencing statute.[14] It then cited that court's admonition that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [other courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), quoted in Bottoson, 833 So.2d at 695.
Several justices wrote separate opinions in Bottoson explaining their concerns with Ring, some believing that Ring may apply to Florida's sentencing scheme in some circumstances. No majority view emerged, however.
In King, 831 So.2d at 143, decided the same day as Bottoson, the Court was similarly splintered. This time, the per curiam opinion, based on essentially the same reasoning as the one in Bottoson, garnered only two votes.[15] Again, the justices filed separate opinions, but no majority view prevailed.

C. The Return of the King: Our Subsequent Jurisprudence and Failure to Forge a Majority View
Neither Bottoson nor King, therefore, finally settled the question of whether Ring applies in Florida. As if to emphasize that fact, virtually every post-conviction appeal filed in this Court continues to raise the Ring issue. In the ensuing months, we have repeatedly denied relief *937 under Ring in both direct appeals and post-conviction cases, relying for the most part on citations to Bottoson and King.[16] Chief Justice Anstead has reminded us, however, that neither Bottoson nor King garnered a majority.[17]
Despite the ever-growing mountain of cases raising this issue, we have come no closer to forging a majority view about whether Ring applies in Florida than we did in Bottoson and King. See Allen v. State, 854 So.2d 1255, 1263 (Fla.2003) (noting that "we have not yet as a Court determined whether Ring has any applicability to Florida's death penalty scheme or if so, whether any aspect of that holding would be retroactive to cases already final") (Pariente, J., specially concurring). Some of us, however, have staked out clear positions. For example, Justice Wells, Justice Quince, and I rely on the United States Supreme Court's admonition not to assume that the Court has overruled its prior decisions unless it does so explicitly.[18] Chief Justice Anstead, on the other hand, believes that Ring applies in Florida and that it requires a jury to determine all aggravating factors.[19] And Justice Pariente *938 believes that Ring applies but that its requirements are satisfied as long as the jury finds one aggravating factor  which in most cases will be the prior violent felony aggravator  because that finding renders the defendant eligible for the death penalty.[20]
Curiously, although both Bottoson and King involved post-conviction relief  that is, the convictions of both defendants had become final  and although the State contended that Ring did not apply retroactively, only Justice Shaw, in his separate opinion in Bottoson, has analyzed whether Ring applies retroactively. 833 So.2d at 711-19. Even after Bottoson and King, none of our cases have addressed that issue; and neither Chief Justice Anstead nor Justice Pariente, who believe that Ring requires a Florida jury to determine either some (J. Pariente) or all (C.J. Anstead) aggravators, has analyzed whether such requirements apply retroactively.
The United States Supreme Court has long considered retroactivity a threshold issue, which must be considered first in determining whether a defendant seeking post-conviction relief is entitled to the benefits of a new decision. In Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), in which the Supreme Court changed the standard for determining whether a newly created criminal rule should be applied retroactively, the Court noted that retroactivity "is properly treated as a threshold question." Id. at 300, 109 S.Ct. 1060 (plurality opinion).[21] Florida courts, too, consider the issue of retroactivity *939 as a threshold matter. See State v. Will, 645 So.2d 91, 94 (Fla. 3d DCA 1994); Dupont v. State, 514 So.2d 1159, 1160 (Fla. 2d DCA 1987).
Recently, the Eleventh Circuit considered retroactivity as a threshold issue. On appeal from denial of federal habeas relief, the court refused to consider whether Florida's capital sentencing scheme violates Ring because it determined the issue was procedurally barred and that under Teague, Ring did not apply retroactively anyway. See Turner v. Crosby, 339 F.3d 1247 (11th Cir.2003), cert. denied, No. 03-9251, ___ U.S. ___, 124 S.Ct. 2104, 158 L.Ed.2d 718 (U.S. 2004).[22]
Considering retroactivity first makes sense because, if we address the merits of a claim in a post-conviction case but then decide that a prior case does not apply retroactively, our discussion of the merits becomes mere dictum. Yet by discussing the merits, we risk creating confusion in the bench and bar because many  perhaps even we  will interpret our discussion as a holding or will assume that we have implicitly held the prior decision retroactive.[23] We should not announce broad statements of law, or even address such issues  as we did in Bottoson and King  unless and until we decide that such a discussion would apply to the case under review.
That this Court has not routinely addressed retroactivity first, as Justice Pariente contends, specially concurring op. at 933, provides no justification for continuing the practice. Before considering the merits of any claims raised in the appeals and petitions before it, this Court generally addresses a number of asserted procedural and jurisdictional bars. We determine whether the issue was preserved, whether a claimed error constitutes fundamental error that may be raised for the first time on appeal, or whether notice of appeal was timely filed. The retroactivity of new decisions presents a similar procedural issue.
Nor does it matter, as Justice Pariente suggests, specially concurring op. at 934, that the issue of Ring's retroactivity is currently pending in the United States Supreme Court. Unless this Court adopts my view that we should apply a Teague analysis to retroactivity issues (see part II A below), that case will not determine Ring's retroactivity under this Court's Witt analysis (which is precisely why I believe we should adopt the same test the Supreme Court uses).
Because we continue to address the Ring issue on the merits, even in post-conviction appeals, a growing number of petitioners have argued that we already *940 have decided that Ring applies retroactively. Of course that is not the case. As I stated earlier, only one justice on this Court has even addressed the issue of retroactivity. But the fact that we have not addressed it, coupled with our repeated discussion of the merits of Ring claims, apparently has created this impression. Therefore, because many post-conviction appeals we decide raise the Ring issue, because the issue of retroactivity should be a threshold question in a post-conviction case determining the applicability of a new case, and because a majority of this Court thus far has been unable to agree on whether Ring applies to Florida's death penalty scheme, we should address whether Ring would apply retroactively. I now turn to that issue.

II. Is Ring Retroactive?
When the United States Supreme Court or this Court renders a decision that affects criminal defendants, the question becomes: who may benefit from the decision? We have held that such decisions apply in all cases to convictions that are not yet final  that is, convictions for which an appellate court mandate has not yet issued. Smith v. State, 598 So.2d 1063, 1066 (Fla.1992) (holding that "any decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review or not yet final"), limited by Wuornos v. State, 644 So.2d 1000, 1007 n. 4 (Fla.1994) (reading Smith"to mean that new points of law established by this Court shall be deemed retrospective with respect to all non-final cases unless this Court says otherwise").
Once a conviction is final, however, the state acquires an interest in the finality of the convictions. In Witt, we emphasized the importance of finality:
The importance of finality in any justice system, including the criminal justice system, cannot be understated. It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must eventually become final simply to allow effective appellate review of other cases. There is no evidence that subsequent collateral review is generally better than contemporaneous appellate review for ensuring that a conviction or sentence is just. Moreover, an absence of finality casts a cloud of tentativeness over the criminal justice system, benefiting neither the person convicted nor society as a whole.
387 So.2d at 925; see also United States v. Addonizio, 442 U.S. 178, 184 n. 11, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (noting that "[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures"); State v. Callaway, 658 So.2d 983, 986 (Fla.1995) (noting that "the fundamental consideration is the balancing of the need for decisional finality against the concern for fairness and uniformity in individual cases").
Therefore, the issue is whether such cases can be applied to defendants whose convictions already were final when the decision was rendered. Both federal and state courts, sometimes using different standards for determining retroactivity, have divided on whether Ring applies retroactively. The Seventh and Eleventh Circuits, as well as four state supreme courts, have held that Ring does not apply retroactively. See Turner, 339 F.3d at 1284; Lambert v. McBride, 365 F.3d 557 (7th Cir.2004); State v. Towery, 204 Ariz. 386, 64 P.3d 828, 836, cert. dismissed, 539 U.S. 986, 124 S.Ct. 44, 156 L.Ed.2d 702 (2003); Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 619 (2003); State v. Lotter, 266 *941 Neb. 245, 664 N.W.2d 892, 908 (2003), petition for cert. filed, No. 03-7361 (U.S. Nov. 7, 2003); Colwell v. State, 118 Nev. 807, 59 P.3d 463, 471 (2002), cert. denied, 540 U.S. 981, 124 S.Ct. 462, 157 L.Ed.2d 370 (2003). The Ninth Circuit, and one state supreme court, have held that it does. See Summerlin v. Stewart, 341 F.3d 1082, 1121 (9th Cir.) (en banc), cert. granted, 540 U.S. 1045, 124 S.Ct. 833, 157 L.Ed.2d 692 (2003); State v. Whitfield, 107 S.W.3d 253, 268 (Mo.2003).
In part II A below, I analyze which standard for retroactivity should apply: the Witt standard we have been using, or the Teague standard the United States Supreme Court adopted nine years after Witt. In parts II B and II C, I conclude that under either standard, Ring does not apply retroactively.

A. Which Standard Should We Use for Determining Retroactivity?
The first question in determining retroactivity is which standard should apply. Although we have long used the standard announced in Witt, valid reasons exist for reconsidering it. Witt was based on then-existing United States Supreme Court jurisprudence on retroactivity. Since Witt, however, that jurisprudence has drastically changed.

1. Linkletter and Stovall

In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court first attempted to establish some standards for determining the retroactivity of new rules. The issue was whether Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which made the exclusionary rule for evidence applicable to the states, applied retroactively. 381 U.S. at 636-40, 85 S.Ct. 1731. To answer the question, the Court adopted a three-part test that considered (a) the purpose to be served by the new rule, (b) the extent of reliance on the prior rule, and (c) the effect retroactive application of the new rule would have on the administration of justice. Using that standard, the Court held that Mapp would only apply to trials commencing after that case was decided. 381 U.S. at 636-40, 85 S.Ct. 1731. Two years later, in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Court applied the Linkletter factors and held that the rule requiring exclusion of identification evidence tainted by exhibiting the accused for identifying witnesses before trial in the absence of counsel also did not apply retroactively. 388 U.S. at 300, 87 S.Ct. 1967. Stovall also held that the new rule would not apply even to cases pending on direct review. Id. at 300-01, 87 S.Ct. 1967.

2. Witt

In Witt, decided in 1980, we adopted the Linkletter standards. In that case, we held that a change in the law does not apply retroactively "unless the change: (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." 387 So.2d at 931. As to consideration (c), we stated that most major constitutional changes fall into one of two categories: (1) changes "which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties" and (2) those "which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter" (the Linkletter factors). 387 So.2d at 929.[24]
*942 In Witt, we were concerned that an expansive view of retroactivity would undermine the finality of judicial decisions. We noted that "[t]he reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice." 387 So.2d at 925 (quoting Addonizio, 442 U.S. at 184, 99 S.Ct. 2235). We also warned that "[t]he doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications." Id. We "declare[d] our adherence to the limited role for post-conviction relief proceedings, even in death penalty cases." Id. at 927 (emphasis added). Although when we decided Witt the United States Supreme Court's jurisprudence of retroactivity was extremely complex, we distilled the three essential factors outlined above as stated in Stovall and Linkletter.
Essentially, then, in Witt we adopted a narrow standard for the retroactivity of decisions, limiting retroactivity to cases involving constitutional issues of fundamental significance.

3. Teague

Nine years after we adopted the Linkletter factors in Witt, the United States Supreme Court revamped its retroactivity analysis. The plurality recognized that "[t]he Linkletter retroactivity standard has not led to consistent results," 489 U.S. at 302, 109 S.Ct. 1060, and that "commentators have `had a veritable field day' with the Linkletter standard, with much of the discussion being `more than mildly negative.'" Id. at 303, 109 S.Ct. 1060. Much of the criticism concerned the Court's refusal to apply new rules even to cases still pending on direct review. See, e.g., Johnson v. New Jersey, 384 U.S. 719, 733-35, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (holding that under the Linkletter standard Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), applied only to trials commencing after that decision had been announced). Therefore, by the time it decided Teague, the Court already had rejected that part of Linkletter in favor of applying new rules to cases pending on direct review. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
But, as the Supreme Court recognized in Teague, 489 U.S. at 305, 109 S.Ct. 1060, the problems with Linkletter were not limited to its refusal to apply new rules to cases pending on direct review. The Linkletter standard also led to disparity in the treatment of similarly situated defendants collaterally attacking their convictions.[25] Whether a defendant received the benefit of a particular decision often depended on the jurisdiction. Id. In addition, the Linkletter factors are, to an extent, vague and malleable. The extent to which courts and the public have relied on a prior rule is difficult to calculate, and the effect retroactive application of a new rule will have on the administration of justice can sometimes be unpredictable.
To resolve these criticisms of Linkletter, in Teague the Supreme Court adopted the approach of Justice Harlan, expressed in cases such as Mackey v. United States, 401 U.S. 667, 675, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part), and Desist v. United States, 394 U.S. 244, 256, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting). Under that approach, new rules should be applied to all cases *943 pending on direct review and generally not be applied to cases on collateral review.[26] The Court therefore held that decisions announcing new constitutional rules would only be applied retroactively on collateral review under two circumstances: (1) decisions placing conduct beyond the power of the government to proscribe; and (2) decisions announcing a "watershed" rule of criminal procedure that is "implicit in the concept of ordered liberty." 489 U.S. at 311, 109 S.Ct. 1060 (quoting Mackey v. United States, 401 U.S. at 693, 91 S.Ct. 1160 (Harlan, J., concurring in judgments in part and dissenting in part)). In other words, a rule "must implicate the fundamental fairness of the trial." Id. at 312, 109 S.Ct. 1060.[27]
The new standard in Teague substantially narrowed the circumstances in which the Supreme Court's adoption of new criminal rules apply retroactively. After Teague, such rules are presumed not to.

4. What Happened to Witt after Teague?
Although under Teague state courts are free to adopt more expansive standards for retroactivity, 28 state supreme courts, as well as the District of Columbia, have adopted the Teague standard at least to cases stemming from a federal constitutional right, and the vast majority to all questions of retroactivity.[28] Only six state supreme courts have decided against adopting Teague's retroactivity standards to questions of federal constitutional law.[29] *944 The remaining states have not reassessed their standards for retroactivity in light of Teague.
Florida is one of those states that have not addressed Teague in the fourteen years since it was decided. As several district courts of appeal have noted,[30] even after Teague this Court has continued to apply the Linkletter factors. We have never consciously considered Teague, however. In fact, we have only mentioned the case once, in describing the Eleventh Circuit's denial of habeas relief to a defendant sentenced to death. See Glock v. Moore, 776 So.2d 243, 248 (Fla.2001).[31]
We should now adopt Teague in cases considering the retroactivity of decisions of the United States Supreme Court. We should not apply a different standard for determining the retroactivity of United States Supreme Court decisions than that Court itself applies. Consistency among the states  and between the state and federal courts  in applying decisions of the United States Supreme Court demands that, to the extent possible, standards for retroactivity be uniform. Otherwise, the retroactivity of a decision of the Supreme Court will depend on the jurisdiction in which the defendant was prosecuted. Although such a result is sometimes unavoidable, we should attempt as much as possible to limit such lack of uniformity. Also, even more than Linkletter, the Teague standards respect the finality of decisions, a concept we considered of utmost importance in Witt.
The Court's decision to alter its retroactivity standard in Teague was based on two overriding considerations: the interests of comity and finality. 489 U.S. at 308, 109 S.Ct. 1060. Although the concept of comity is not relevant to our analysis, the concept of finality is. Regarding the importance of finality, the Court noted that "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." Id. at 309, 109 S.Ct. 1060. See also Mackey, 401 U.S. at 691, 91 S.Ct. 1160 (Harlan, J., concurring in judgments in part and dissenting in part) ("No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation...."), quoted in Teague, 489 U.S. at 309, 109 S.Ct. 1060.
Of course, this compelling interest in finality applies just as strongly to state court determinations of retroactivity. In fact, it is the very foundation of our analysis in Witt. As we acknowledged there, Florida Rule of Criminal Procedure 3.850 was originally patterned after the federal *945 habeas corpus rule and was promulgated to provide "a method of reviewing a conviction based on a major change of law, where unfairness was so fundamental in either process or substance that the doctrine of finality had to be set aside." Witt, 387 So.2d at 927. In Witt, we recognized that only "a sweeping change of law ... [that] drastically alter[s] the substantive or procedural underpinnings of a final conviction and sentence," id. at 925, should be applied retroactively because applying any other standard would "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." Id. at 929-30. Clearly, our interests in finality and the narrow retroactive application of new legal principles coincides with the interests the Supreme Court articulated in Teague. As illustrated in section II A of this opinion, however, the Supreme Court has found that the Linkletter factors, the underpinning of our retroactivity analysis in Witt, do not well serve these interests. Therefore, I believe we should adopt the retroactivity analysis announced in Teague in determining whether we should retroactively apply new constitutional rules emanating from the United States Supreme Court.
As I demonstrate below, although I believe we should adopt the Teague standard, I do not believe it ultimately matters in determining whether Ring applies retroactively. Whether we analyze the issue under Teague (as I do in part II B below) or under Witt (as I do in part II C), the result is the same: Ring does not apply retroactively.

B. Application of the Teague Standard Dictates that Ring Not Be Applied Retroactively
In Teague, the Supreme Court held that new constitutional rules of criminal procedure would not apply to final cases, with two exceptions. 489 U.S. at 311, 109 S.Ct. 1060. Thus, the first consideration is whether Ring announced a new constitutional rule and, if so, whether the rule is procedural or substantive. See Bousley v. United States, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (stating that Teague"by its own terms applies only to procedural rules" and that the "distinction between substance and procedure is an important one in the habeas context"). If the rule is substantive, it must be applied retroactively. If it is procedural, it will not be applied retroactively unless (1) it places conduct beyond the power of the government to proscribe; or (2) it announces a "watershed" rule of criminal procedure that is "implicit in the concept of ordered liberty." 489 U.S. at 311, 109 S.Ct. 1060 (quoting Mackey, 401 U.S. at 693, 91 S.Ct. 1160 (Harlan, J., concurring in judgments in part and dissenting in part)).
Of course, by overruling its prior decision in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to apply its more recent decision in Apprendi to death penalty cases, the Court necessarily issued a new constitutional rule. See Teague, 489 U.S. at 301, 109 S.Ct. 1060 (explaining that for retroactivity purposes a new rule "breaks new ground or imposes a new obligation on the States or the Federal Government," i.e., "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final"). Therefore, the remaining questions are (1) whether the rule is procedural or substantive; and if procedural, (2) whether one of the two exceptions to the rule of nonretroactivity applies. 489 U.S. at 311, 109 S.Ct. 1060. I address these questions below.

*946 1. Is Ring Substantive or Procedural?
The next step is to determine whether the new constitutional rule in Ring is procedural or substantive. The decision in Ring, however, simply applied the Court's decision in Apprendi to the death penalty context. Therefore, before considering whether Ring created a substantive rule, I will first discuss whether Apprendi did.
The Supreme Court in Apprendi acknowledged that it was addressing New Jersey's criminal procedure, and not its substantive law. See Apprendi, 530 U.S. at 475, 120 S.Ct. 2348 ("The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is."). The effect of its rule was solely to shift factfinding responsibility from the judge to the jury and to increase the burden of proof for those facts that increase the penalty for a crime beyond its statutory maximum.
Several federal and Florida appellate courts have concluded that Apprendi's holding constituted a new procedural rule that did not apply retroactively.[32] In Curtis v. United States, 294 F.3d 841, 843 (7th Cir.), cert. denied, 537 U.S. 976, 123 S.Ct. 451, 154 L.Ed.2d 334 (2002), for example, the court noted that "Apprendi is about nothing but procedure  who decides a given question (judge versus jury) and under what standard (preponderance versus reasonable doubt)." In Figarola v. State, 841 So.2d 576 (Fla. 4th DCA 2003), notice invoking discretionary jurisdiction filed, No. SC03-586 (Fla. Apr. 7, 2003), the Fourth District Court of Appeal recently noted that the Supreme Court itself characterized Apprendi as a procedural rule. Id. at 577 n. 3.
In Ring, the Court merely extended Apprendi to the death penalty context to hold that the Sixth Amendment requires that the aggravating factors in capital cases be found by a jury, not a judge alone. See 536 U.S. at 609, 122 S.Ct. 2428. The Court itself described the question before it in Ring as "who decides, judge or jury." 536 U.S. at 605, 122 S.Ct. 2428. Therefore, as the Eleventh Circuit recently acknowledged, "[j]ust as Apprendi `constitutes a procedural rule because it dictates what fact-finding procedure must be employed,' Ring constitutes a procedural rule because it dictates what fact-finding procedure must be employed in a capital sentencing hearing." Turner, 339 F.3d at 1284 (citations omitted). The Eleventh Circuit "agree[d] with other courts who have concluded that because Apprendi was a procedural rule, it automatically follows that Ring is also a procedural rule." Id.; see *947 also Lambert, 365 F.3d at 562 ("Because the rule in Apprendi is not retroactive ..., it stands to follow that the rule in Ring, an Apprendi child, is not retroactive for the same reasons."); Towery, 64 P.3d at 833 ("Logic dictates that if Apprendi announced a procedural rule, then, by extension, Ring... did also."); cf. Cannon v. Mullin, 297 F.3d 989, 994 (10th Cir.2002) (concluding, in the context of a successive habeas petition, that "[i]t is clear ... that Ring is simply an extension of Apprendi to the death penalty context"). In Turner, the Eleventh Circuit explained why Ring affected only procedure:

Ring changed neither the underlying conduct the state must prove to establish a defendant's crime warrants death nor the state's burden of proof. Ring affected neither the facts necessary to establish Florida's aggravating factors nor the state's burden to establish those factors beyond a reasonable doubt. Instead, Ring altered only who decides whether any aggravating circumstances exist and, thus, altered only the fact-finding procedure.
339 F.3d at 1284; see also Towery, 64 P.3d at 833 (noting that Ring only altered "who decides whether any aggravating circumstances exist, thereby altering the fact-finding procedures used in capital sentencing hearings").
Only one court has held that Ring imposed a substantive rather than a procedural rule. In Summerlin, 341 F.3d at 1108, the Ninth Circuit recently concluded that Ring redefined Arizona's capital murder law, making murder and capital murder separate substantive offenses. The Ninth Circuit concluded that the rule in Ring is substantive and that Teague does not apply. In my opinion, Summerlin misinterprets the analysis in Ring.
The Supreme Court in Ring did not substantively change Arizona's death penalty law, as the Ninth Circuit claims. To the contrary, it deferred to the Arizona Supreme Court's interpretation of that law. The Court "[r]ecogniz[ed] that the Arizona court's construction of the State's own law is authoritative." 536 U.S. at 603, 122 S.Ct. 2428. Based on the Arizona Supreme Court's interpretation, the Court then stated, quoting from Apprendi, that "[b]ecause Arizona's enumerated aggravated factors operate as `the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609, 122 S.Ct. 2428 (citation omitted). The Supreme Court's characterization of its holding in Apprendi, which it expressly stated addressed procedure, was no different. See id. at 602, 122 S.Ct. 2428. The Court explained that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death." Id. at 609, 122 S.Ct. 2428. In other words, the Court's analyses in Apprendi and Ring are identical. The hate crime aggravator in Apprendi operated the same way the aggravator necessary for imposition of the death penalty operated in Walton and Ring. Thus, the Court's holding in both Apprendi and Ring only specified the procedure required for determining a fact that increases a defendant's punishment beyond the statutory maximum. See Summerlin, 341 F.3d at 1126 (Rawlinson, J., dissenting) ("The linkage in Ring of the Walton death penalty factors and the Apprendi hate crime aggravator is fatal to the majority's syllogism."). The rule of Ring is thus procedural, not substantive.

2. Does an Exception to Teague's General Rule of Non-Retroactivity Apply?
Because the rule in Ring is procedural and presumed not to be retroactive, the *948 next step in the Teague analysis is to determine whether the rule falls within one of Teague's two exceptions: a rule that places certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe, or a rule that requires the observance of procedures implicit in the concept of ordered liberty. 489 U.S. at 307, 109 S.Ct. 1060. Ring obviously does not fall within the first exception. Ring does "not decriminalize any class of conduct or prohibit a certain category of punishment for a class of defendants." McCoy, 266 F.3d at 1256-57. As I explain below, it does not meet the requirements of the second, either.
The Court in Teague explained that the second exception applies to a watershed rule "without which the likelihood of an accurate conviction is seriously diminished" and which alters our understanding of the bedrock procedural elements necessary to the fundamental fairness of a proceeding. 489 U.S. at 313, 109 S.Ct. 1060. The Court emphasized that this was a narrow exception, noting that it was "unlikely that many such components of basic due process have yet to emerge." Id. at 313, 109 S.Ct. 1060. Ring's effect at most is to place the responsibility for factfinding in the penalty phase on a jury. It implicates neither the accuracy of the conviction nor the fundamental fairness of the process.
In Ring, Arizona contended that allowing a judge to find aggravating factors would better assure the fairness of the death penalty. The Court responded that "[t]he Sixth Amendment jury trial right, however, does not turn on the relative rationality, fairness, or efficiency of potential factfinders." 536 U.S. at 607, 122 S.Ct. 2428 (emphasis added). While allowing a judge to act as the factfinder "might be `an admirably fair and efficient scheme of criminal justice,'" the Court commented, the Constitution grants a right to a jury trial. Id. at 607, 122 S.Ct. 2428 (quoting Apprendi, 530 U.S. at 498, 120 S.Ct. 2348 (Scalia, J., concurring)).
Because it relied solely on the Sixth Amendment right to jury trial, the Court did not even suggest that its holding reflected concerns for the accuracy of the factfinding or the fairness of the penalty phase proceeding. As the Eleventh Circuit stated in determining that Ring does not apply retroactively, "Ring is based on the Sixth Amendment right to a jury trial and not on a perceived, much less documented, need to enhance accuracy or fairness of the fact-finding in a capital sentencing context." Turner, 339 F.3d at 1286. See also Colwell, 59 P.3d at 473 (noting that "we believe it is clear that Ring is based simply on the Sixth Amendment right to a jury trial, not on a perceived need to enhance accuracy in capital sentencings, and does not throw into doubt the accuracy of death sentences handed down by three-judge panels in this state").
The one court that has held Ring to apply retroactively under Teague overlooks this aspect of Ring. In Summerlin, the Ninth Circuit examined in detail Arizona's death penalty sentencing procedures and held that Ring created a watershed rule of procedure because a "requirement of capital findings made by a jury will improve the accuracy of Arizona capital murder trials" and that failure to have a jury act as factfinder during the penalty phase was a structural defect that affected the framework of the trial. 341 F.3d at 1116.[33] The Supreme *949 Court's own statements in Ring, cited above, belie such an interpretation. The Supreme Court did not weigh the relative merits of judge and jury factfinding and conclude that jury trials produced more accurate results. It simply held that the Constitution granted the absolute right to jury factfinding (whenever particular facts increased the maximum penalty provided by statute) regardless of its fairness or accuracy.
Other decisions of the Supreme Court concerning the right to a jury trial confirm that it does not consider such decisions watershed rules that implicate the concept of ordered liberty. For example, the Supreme Court has not previously treated denial of the right to have a jury decide an element of an offense as structural error. See, e.g., Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In Neder, the defendant was convicted of tax fraud after trial by jury in which the judge, in accordance with extant law, refused to instruct the jury on the essential element of materiality and decided the question himself. Before Neder's conviction became final, the Court decided United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), holding that materiality is an element that must be decided by the jury. In determining whether harmless error analysis applied to the trial court's undisputed error, the Court commented that structural error, which is not subject to such analysis, is a limited class of constitutional error that renders a trial fundamentally unfair, such that the trial cannot reliably serve as a basis for the determination of guilt or innocence or for criminal punishment. 527 U.S. at 8-9, 119 S.Ct. 1827. The Court held that failure to submit an element to the jury did not constitute structural error and recognized that although failure to submit an element of an offense to the jury violates the right to a jury trial, such error was subject to harmless error analysis. 527 U.S. at 9, 12, 119 S.Ct. 1827.[34]
More recently, the Supreme Court held that an unpreserved Apprendi error did not constitute plain error. In United States v. Cotton, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), the federal indictment charged the defendants with drug offenses, without specifying an amount. At sentencing, the court found a quantity that permitted imposition of enhanced sentences. The Supreme Court recognized that Apprendi error occurred, but concluded that even if the error affected "substantial rights," it did not seriously affect the fairness, integrity, or public reputation of the proceedings. 535 U.S. at 633-34, 122 S.Ct. 1781.
Finally, in yet another case, the Supreme Court held, under the less-stringent Linkletter standard, that its holding in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that the basic Sixth Amendment right to a jury trial applies to the States through the *950 Fourteenth Amendment, did not apply retroactively. See DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968). The Court stated that "[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial." Id. at 634, 88 S.Ct. 2093. If the right to a jury trial itself does not implicate such fundamental rights as to apply retroactively, I fail to see how a mere subset of that right  the right to have a jury determine facts relevant to sentencing  can do so.
Even if the Ninth Circuit were correct in Summerlin that Ring addressed structural error  despite the cases contradicting such a conclusion  the Supreme Court has clarified that classifying an error as structural does not necessarily implicate the second Teague exception. See Tyler, 533 U.S. at 666-67 & n. 7, 121 S.Ct. 2478. The Court again emphasized that "the second Teague exception is reserved only for truly `watershed' rules." Id. at 667 n. 7, 121 S.Ct. 2478.
In light of the Supreme Court's own precedent and its own analysis in Ring, which rested solely on the Sixth Amendment right to jury trial, the new procedural rule announced in Ring fails to meet the requirements of the second Teague exception. Therefore, Ring does not apply retroactively.

C. Even Under a Witt Analysis, Ring Still Does Not Apply Retroactively
Even if we ignore the United States Supreme Court's change of its own jurisprudence and continue applying the outdated Linkletter standard, the result is the same: Ring does not apply retroactively. As stated above, under that standard, a change in the law does not apply retroactively "unless the change: (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." 387 So.2d at 931. Clearly, the holding of Ring meets the first two prongs of Witt, i.e., the United States Supreme Court issued a new rule that is constitutional in nature. See Witt, 387 So.2d at 930. Therefore, the question of Ring's retroactive application rests on the third prong of Witt: whether the rule constitutes a development of fundamental significance.
In Witt, we stated that most major constitutional changes fall within one of two categories: changes "which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties" and those "which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter." 387 So.2d at 929. The holding in Ring, like the holding in Apprendi, does not fall within the first category  it does not prohibit the government from criminalizing certain conduct. Therefore, the question is whether Ring is of sufficient magnitude to require retroactive application. This leads us to the Linkletter factors: (a) the purpose to be served by the new rule, (b) the extent of reliance on the prior rule, and (c) the effect retroactive application of the new rule would have on the administration of justice. See Witt, 387 So.2d at 926. I address each factor in turn.

1. The Purpose to Be Served by the New Rule
The first factor under the Linkletter test is the purpose the new rule is intended to serve. Witt, 387 So.2d at 926. As I explained at section II B 1 above, Ring creates a rule of procedure. It merely applied the Apprendi rule to death penalty cases. Thus, Ring's holding, too, constitutes a procedural rule. See Turner, 339 F.3d at 1284 (noting that "because Apprendi was a procedural rule, it axiomatically *951 follows that Ring is also a procedural rule"). This transfer of factfinding responsibility thus does not impugn the fairness of any prior penalty phase process in death penalty cases. See Witt, 387 So.2d at 929 (stating that a change in law does not warrant retroactive application "in the absence of fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding").
Other jurisdictions have arrived at the same conclusion. In Towery, 64 P.3d at 835, the Arizona Supreme Court examined Ring under the equivalent of the Linkletter test. Regarding the first prong of the test, the Arizona court concluded that because Ring was "not designed to improve [the] accuracy" of criminal trials, the rule's purpose did not support its retroactive application. Id. (citing Allen v. Hardy, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), which stated that retroactive application is appropriate if a new rule is designed to enhance accuracy of criminal trials); accord Turner, 339 F.3d at 1286 (noting that "Ring is based on the Sixth Amendment right to a jury trial and not on a perceived, much less documented, need to enhance accuracy or fairness of the fact-finding in a capital sentencing context").
The United States Supreme Court has held that the right to a jury trial alone is not a sufficient basis for retroactive application of a new rule. In DeStefano, 392 U.S. at 633-34, 88 S.Ct. 2093, the Court, in applying the Linkletter test, reiterated that it did not believe that trial before a judge alone is unfair. Both the Missouri and Arizona Supreme Courts relied on DeStefano in concluding that this factor weighs against retroactivity. See Towery, 64 P.3d at 834; Whitfield, 107 S.W.3d at 268.
For these reasons, I too conclude that this prong  the purpose to be served by the rule  weighs against the retroactive application of Ring.

2. The Extent of Reliance on the Old Rule
The second factor under the Linkletter test is the extent of reliance on the old rule. Witt, 387 So.2d at 926. This factor, too, weighs against retroactivity. The United States Supreme Court has examined and upheld Florida's capital sentencing statute for over a quarter of a century. See Bottoson, 833 So.2d at 695 (citing cases). Literally hundreds of defendants have been sentenced to death, and 58 inmates executed, since reinstatement of Florida's death penalty in 1972.[35] In addition, as noted above, in Apprendi, decided in 2000, the Court held that the new rule did not apply in capital proceedings and specifically upheld its prior decision on the issue in Walton, 497 U.S. at 639, 110 S.Ct. 3047, which it then overruled in part in Ring. See Towery, 64 P.3d at 835 (noting that "[c]ertainly the Arizona justice system acted in good faith in applying the holding of Walton until the Court overruled its decade-old decision"). Thus, the extent of the reliance on Florida's death penalty statute has been vast and in good faith.[36]

3. The Effect of Retroactive Application of the New Rule on the Administration of Justice
The third and final factor is the effect of retroactive application on the administration *952 of justice. Witt, 387 So.2d at 926. In my opinion, applying Ring retroactively would have a potentially drastic effect on the administration of the death penalty in Florida. Over 360 inmates currently reside on Death Row.[37] Many of their convictions are decades old. The retroactive application of Ring would require consideration of each of these cases to determine whether Ring requires new penalty phase sentencing proceedings. A substantial percentage of those cases will require new proceedings. The difficulties of such an enormous undertaking include lost evidence and unavailable witnesses. In addition, new proceedings would cause the further painful disruption of the lives of the families and friends of victims and affect the finality of judgments. To apply Ring retroactively would "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." Witt, 387 So.2d at 929-30.
Accordingly, none of the three Linkletter factors weighs in favor of the retroactive application of Ring. I would hold that Ring does not apply retroactively and would deny relief as to any Ring claim presented in this case and all future post-conviction proceedings on this basis alone.

CONCLUSION
I concur in affirming the trial court's denial of relief in this case. In addressing the Ring issue, given the number of petitions we regularly receive arguing violations of Ring, and given our prior lack of consensus about whether Ring applies in Florida, I would decide whether, even if Ring applied in Florida, it would apply retroactively to cases on collateral review. I would then adopt the standard for determining retroactivity enunciated in Teague and, applying that standard, hold that Ring does not apply retroactively. Even if we continue to apply the factors we adopted in Witt, however, the result would be the same.
WELLS and BELL, JJ., concur.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for its discussion of the impact of the U.S. Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] The aggravating factors were: (1) Windom had been previously convicted of another offense or felony involving the use of threat or violence to the person; and (2) the crime was cold, calculated, and premeditated (CCP).
[2] The statutory mitigating factors were: (1) Windom had no significant history of prior criminal activity (some weight); (2) the capital felony was committed while Windom was under the influence of extreme mental or emotional disturbance (very slight weight); and (3) Windom acted under extreme duress or under substantial domination of another person (little weight).
[3] The nonstatutory mitigating factors were: (1)Windom assisted people in the community (little weight); (2) Windom was a good father (little weight); (3) Windom saved his sister from drowning (very little weight); and (4) Windom saved another individual from being shot during a dispute over twenty dollars (very little weight).
[4] On direct appeal, Windom asserted: (1) the prosecutor's discriminatory use of peremptory challenges denied Windom his right to an impartial jury; (2) the trial court erred in allowing the State to introduce irrelevant, prejudicial evidence of a nonstatutory aggravating factor; (3) the trial court erred in failing to conduct an adequate hearing concerning the competency of his trial counsel; (4) the trial court erred in allowing the introduction of prejudicial photographs of the victims; (5) the trial court erred in denying defendant's attempt to call a witness; (6) the trial court erred in its instruction on the CCP aggravating factor; (7) the trial court erred in finding that the crimes were committed in a CCP manner; (8) the trial court erred in finding the prior violent felony aggravating factor; (9) the death penalty was disproportionate in this case; (10) the trial court erred in its instruction on reasonable doubt; (11) the trial court erred in denying Windom's requested special jury instructions at the penalty phase; (12) the trial court improperly rejected mitigating evidence by giving such little, if any, weight; and (13) section 922.141, Florida Statutes (1991), was unconstitutional.
[5] The claims raised by Windom were: (1) Florida's lack of standards for counsel in capital cases led to the post-conviction court's tolerance of an incompetent attorney; (2) his trial counsel was ineffective for failing to adequately investigate and present evidence at the guilt phase of his trial; (3) his trial counsel was ineffective for failing to adequately investigate and present evidence at the penalty phase of the trial; (4) Windom was denied his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), at the guilt and penalty phases because his trial counsel failed to obtain an adequate mental health evaluation and to provide necessary background information to the mental health expert; (5) his trial counsel affirmatively harmed his case by making damaging statements to the court and conceding the State's case; (6) Windom was denied a fair trial due to impermissible considerations and misstatements of law made by the prosecutor, and Windom's trial counsel was ineffective for failing to object; (7) Windom's constitutional rights were violated by the failure of the trial court, prosecutor, and defense counsel to understand and correctly apply the Sixth Amendment requirements of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (8) Windom's convictions are unreliable because of the cumulative effect of his trial counsel's ineffectiveness, improper prosecutorial argument, and improper rulings of the trial court; (9) Windom is innocent of first-degree murder and innocent of the death penalty; (10) Windom was absent from critical stages of the trial; (11) Windom's death sentences are unconstitutional because the trial court improperly shifted the burden of proof to Windom during the penalty phase, and his trial counsel was ineffective for failing to object; (12) Windom's death sentences are premised upon fundamental error because the trial court's instruction as to the CCP aggravating factor was vague; (13) Windom's death sentences are unconstitutional because they are predicated on an automatic aggravating circumstance, and his trial counsel was ineffective for failing to object; (14) the rules prohibiting Windom's lawyers from interviewing jurors to determine the presence of error are unconstitutional; (15) Florida's capital sentencing statute is unconstitutional; (16) execution by lethal injection is a form of cruel and unusual punishment; (17) Windom was denied a proper direct appeal because portions of the record were omitted and counsel failed to raise this argument; (18) the Florida Supreme Court erred in failing to conduct a harmless error analysis after striking an aggravating factor; (19) Windom was denied access to his own trial files; (20) Windom was denied his right to adequate representation because of the lack of funding available to fully investigate and prepare his case; and (21) Windom was denied his constitutional right to public records.
[6] Huff v. State, 622 So.2d 982 (Fla.1993).
[7] However, again I stress that it is for the United States Supreme Court to determine Ring's retroactivity, and to this date, the Court has not held Ring to apply retroactively.
[8] See Davis v. State, 875 So.2d 359, 375, 2003 WL 22722316 (Fla. Nov. 20, 2003) (Wells, J., concurring, joined by Cantero and Bell, JJ.) (adopting Justice Wells' concurring opinion in Duest v. State, 855 So.2d 33, 50 (Fla.2003), in regard to the Ring claim).
[9] See Duest, 855 So.2d at 50 (Pariente, J., specially concurring).
[10] As part of that consensus, I have dissented from the denial of Ring relief in only two cases, both direct appeals, in which the death sentence was not supported by either an "other-conviction" aggravator or a unanimous death recommendation. See Davis v. State, 859 So.2d 465, 485-86 (Fla.2003) (Pariente, J., dissenting); Butler v. State, 842 So.2d 817, 835 (Fla.2003) (Pariente, J., concurring in part and dissenting in part). Of the current members of the Court, it appears that only Chief Justice Anstead is of the view that a prior conviction aggravator alone is insufficient to satisfy Ring. See Duest, 855 So.2d at 54 (Anstead, C.J., concurring in part and dissenting in part) ("I do not believe the Sixth Amendment requirements announced in Ring and Apprendi allow a trial judge alone to find additional aggravating circumstances to be utilized in imposing a death penalty just because a prior violent felony aggravating circumstance need not be found by the jury.").
[11] The federal test under Teague v. Lane, 489 U.S. 288, 311, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), requires a similar determination whether the decision "alter[s] our understanding of the bedrock procedural elements" necessary to the fundamental fairness of a proceeding. Sawyer v. Smith, 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (majority opinion quoting Teague).
[12] Justice Cantero also cites to Zeigler v. Crosby, 345 F.3d 1300, 1312 n. 12 (11th Cir.2003), in which the Eleventh Circuit, citing to Turner, rejected a challenge to the prior violent or capital felony aggravator under Apprendi and Ring on grounds that those decisions did not apply retroactively on collateral review to convictions that are final. Because a majority of this Court considers that aggravator to be an exception to Ring and thus would not grant relief on this ground even in a direct appeal, the footnote in Zeigler is not persuasive authority for nonretroactivity.
[13] I do not suggest that Summerlin will answer the question of Ring's retroactivity in Florida, as Justice Cantero asserts. See specially concurring op. at 939-40. But neither would a decision in Summerlin be irrelevant under the Witt test, in which the consideration of the purpose to be served by the new rule overlaps with the prong of Teague that assesses whether the new rule is substantive or procedural.
[14] See Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
[15] Justice Quince, who joined the plurality opinion in Bottoson, was recused in King.
[16] See, e.g., Rivera v. State, 859 So.2d 495, 508 (Fla.2003); Jones v. State, 855 So.2d 611, 619 (Fla.2003); Conde v. State, 860 So.2d 930, 959 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1885, 158 L.Ed.2d 475 (2004); McCoy v. State, 853 So.2d 396, 409 (Fla.2003); Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003); Fennie v. State, 855 So.2d 597, 607 n. 10 (Fla.2003); Caballero v. State, 851 So.2d 655, 663-64 (Fla.2003); Belcher v. State, 851 So.2d 678, 685 (Fla.2003); Allen v. State, 854 So.2d 1255, 1262 (Fla.2003); Nelson v. State, 850 So.2d 514, 533 (Fla.2003); Wright v. State, 857 So.2d 861 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1715, 158 L.Ed.2d 402 (2004); Blackwelder v. State, 851 So.2d 650, 653-54 (Fla.2003); Duest v. State, 855 So.2d 33, 49 (Fla.2003), cert. denied, No. 03-8841, ___ U.S. ___, 124 S.Ct. 2023, 158 L.Ed.2d 500, 2004 WL 827801 (U.S. Apr. 19, 2004); Cooper v. State, 856 So.2d 969, 977 n. 6 (Fla.2003), cert. denied, 540 U.S. 1222, 124 S.Ct. 1512, 158 L.Ed.2d 159 (2004); Pace v. State, 854 So.2d 167, 181(Fla.2003), cert. denied, 540 U.S. 1153, 124 S.Ct. 1155, 157 L.Ed.2d 1049 (2004); Butler v. State, 842 So.2d 817, 834 (Fla.2003); Taylor v. State, 855 So.2d 1, 13 n. 11 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1605, 158 L.Ed.2d 248 (2004); Banks v. State, 842 So.2d 788, 793 (Fla.2003); Spencer v. State, 842 So.2d 52, 72 (Fla.2003); Grim v. State, 841 So.2d 455, 465 (Fla.), cert. denied, 540 U.S. 892, 124 S.Ct. 230, 157 L.Ed.2d 166 (2003); Lucas v. State, 841 So.2d 380, 389 (Fla.2003); Fotopoulos v. State, 838 So.2d 1122, 1136 (Fla.2002); Marquard v. State, 850 So.2d 417, 431 n. 12 (Fla.2002); Bruno v. Moore, 838 So.2d 485, 492 (Fla.2002), cert. denied, 540 U.S. 840, 124 S.Ct. 100, 157 L.Ed.2d 72 (2003); Kormondy v. State, 845 So.2d 41, 54 (Fla.), cert. denied, 540 U.S. 950, 124 S.Ct. 392, 157 L.Ed.2d 283 (2003); Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003); Anderson v. State, 841 So.2d 390, 408-09 (Fla.), cert. denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003); Conahan v. State, 844 So.2d 629, 642 n. 9 (Fla.), cert. denied, 540 U.S. 895, 124 S.Ct. 240, 157 L.Ed.2d 172 (2003).
[17] See, e.g., Conde, 860 So.2d at 959 n. 18 (Anstead, C.J., concurring in part and dissenting in part); Caballero, 851 So.2d at 664 n. 7 (Anstead, C.J., concurring in part and dissenting in part); Fennie, 855 So.2d at 611(Anstead, C.J., concurring in part and dissenting in part); Nelson, 850 So.2d at 535 (Anstead, C.J., concurring in part and dissenting in part); Duest, 855 So.2d at 57 n. 25 (Anstead, C.J., concurring in part and dissenting in part).
[18] See Bottoson, 833 So.2d at 695 (per curiam opinion); Duest, 855 So.2d at 50 (Wells, J., concurring).
[19] See, e.g., Caballero, 851 So.2d at 664-65 (Anstead, C.J., concurring in part and dissenting in part); Duest, 855 So.2d at 54-56 (Anstead, C.J., concurring in part and dissenting in part); Fennie, 855 So.2d at 611 (Anstead, C.J., concurring in part and dissenting in part); Nelson, 850 So.2d at 535 (Anstead, C.J., concurring in part and dissenting in part); Allen, 854 So.2d at 1263 (concurring in part and dissenting in part); Bottoson, 833 So.2d at 703 (concurring in result only).
[20] See, e.g., Davis v. State, 859 So.2d 465, 485-86 (Fla.2003) (Pariente, J., dissenting); Duest, 855 So.2d at 50-51 (Pariente, J., specially concurring); Caballero, 851 So.2d at 664 (Pariente, J., specially concurring); Cooper, 856 So.2d at 980-81 (Pariente, J., specially concurring); Nelson, 850 So.2d at 534-35 (Pariente, J., specially concurring); Butler, 842 So.2d at 835 (Pariente, J., concurring in part and dissenting in part); Anderson, 841 So.2d at 409 (Pariente, J., concurring in conviction and concurring in result only on sentence); Cole v. State, 841 So.2d 409, 431 (Fla.2003) (Pariente, J., concurring in result only); Fotopoulos, 838 So.2d at 1137 (Pariente, J., concurring in result only); Israel v. State, 837 So.2d 381, 394 (Fla.2002) (Pariente, J., concurring in result only), cert. denied, 539 U.S. 931, 123 S.Ct. 2582, 156 L.Ed.2d 611 (2003); Doorbal, 837 So.2d at 964 (Pariente, J., concurring as to the conviction and concurring in result only as to the sentence); Lawrence v. State, 846 So.2d 440, 456 (Fla.) (Pariente, J., concurring in result only), cert. denied, 540 U.S. 952, 124 S.Ct. 394, 157 L.Ed.2d 286 (2003); Porter v. Crosby, 840 So.2d 981, 987 (Fla.2003) (Pariente, J., concurring in result only); Bottoson, 833 So.2d at 723 (Pariente, J., concurring in result only).
[21] See also Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (holding that "a federal court considering a habeas petition must conduct a threshold Teague analysis when the issue is properly raised by the state"); Goeke v. Branch, 514 U.S. 115, 117, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995) (noting that "[t]he application of Teague is a threshold question in a federal habeas case"); Caspari v. Bohlen, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (holding that "[a] threshold question in every habeas case, therefore, is whether the court is obligated to apply the Teague rule to the defendant's claim" and that, "if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague before considering the merits of the claim"); McCoy v. United States, 266 F.3d 1245, 1255 (11th Cir.2001) (noting that "judicial economy counsels that we determine first whether the Apprendi rule even applies retroactively"), cert. denied, 536 U.S. 906, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002); United States v. Walls, 215 F.Supp.2d 159, 162 n. 3 (D.D.C.2002) (noting that "Apprendi's retroactivity is a `threshold question' that must be determined before reaching the merits of Walls's claim," and citing Caspari); People v. Kizer, 318 Ill.App.3d 238, 251 Ill.Dec. 925, 741 N.E.2d 1103, 1113 (2000) (recognizing that "[r]etroactivity of a proposed rule is a threshold question that must be decided before the merits of a defendant's claim").
[22] Turner's retroactivity analysis is not dictum, as Justice Pariente suggests. Specially concurring op. at 934. The court made it clear that it would not reach the merits of Turner's Ring claim "because (1) Turner is procedurally barred from bringing a Ring claim for the first time in this § 2254 appeal and, alternatively, (2) Ring does not apply retroactively to Turner." 339 F.3d at 1280 (emphasis added). Then in Zeigler v. Crosby, 345 F.3d 1300, 1312 n. 12 (11th Cir.2003), the Eleventh Circuit rejected a Florida death-sentenced defendant's habeas challenge under Ring, holding that "neither Apprendi nor Ring applies retroactively on collateral review to convictions that became final before they were decided" and citing its decision in Turner.
[23] This has happened before. In State v. Hudson, 698 So.2d 831, 833 (Fla.1997), we held that sentencing under the habitual offender statute extended to imposition of a mandatory minimum term. In Newell v. State, 714 So.2d 434, 434-35 (Fla.1998), we granted post-conviction relief under Hudson because in a prior case we had "implicitly acknowledged" that a Hudson issue could be raised in a post-conviction motion. Yet later we expressly held that Hudson did not apply retroactively. See New v. State, 807 So.2d 52, 53 (Fla.2001), cert. denied, 536 U.S. 942, 122 S.Ct. 2626, 153 L.Ed.2d 808 (2002).
[24] Although in Witt we referred to the three-fold test of Stovall and Linkletter, see 387 So.2d at 929, it was Linkletter that established the test. Therefore, in the remainder of this opinion I refer to them as the Linkletter factors.
[25] The plurality attributed the disparity in results under the Linkletter standard to its own "failure to treat retroactivity as a threshold question and the Linkletter standard's inability to account for the nature and function of collateral review." 489 U.S. at 305, 109 S.Ct. 1060.
[26] Although Teague garnered only a plurality, a majority of the Court soon adopted the plurality's approach in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In Penry, the Court also confirmed that the retroactivity standards adopted in Teague applied in the context of capital sentencing. Id. at 313-14, 109 S.Ct. 1060.
[27] The Court subsequently explained that the watershed exception requires two showings. First, "[i]nfringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction." Tyler v. Cain, 533 U.S. 656, 665, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (emphasis added). Second, "the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." Id.
[28] See, e.g., State v. Towery, 204 Ariz. 386, 64 P.3d 828, 836 (2003); People v. Monge, 16 Cal.4th 826, 66 Cal.Rptr.2d 853, 941 P.2d 1121, 1131 (1997); Jurgevich v. Dist. Court, 907 P.2d 565, 567 (Colo.1995); Duperry v. Solnit, 261 Conn. 309, 318, 803 A.2d 287 (2002); Bailey v. State, 588 A.2d 1121, 1127 (Del.1991); Davis v. Moore, 772 A.2d 204, 230 (D.C.2001); Harris v. State, 273 Ga. 608, 543 S.E.2d 716, 717 (2001); People v. Flowers, 138 Ill.2d 218, 149 Ill.Dec. 304, 561 N.E.2d 674, 682 (1990); Daniels v. State, 561 N.E.2d 487, 489 (Ind.1990); Brewer v. State, 444 N.W.2d 77, 81 (Iowa 1989); State v. Neer, 247 Kan. 137, 795 P.2d 362, 366-67 (1990); Taylor v. Whitley, 606 So.2d 1292, 1296 (La.1992); Commonwealth v. Bray, 407 Mass. 296, 553 N.E.2d 538, 540 (1990); Nixon v. State, 641 So.2d 751, 753 (Miss.1994); State v. Egelhoff, 272 Mont. 114, 900 P.2d 260, 267 (1995), rev'd on other grounds, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); State v. Lotter, 266 Neb. 245, 664 N.W.2d 892, 904 (2003); State v. Tallard, 149 N.H. 183, 816 A.2d 977, 979-81 (2003); People v. Eastman, 85 N.Y.2d 265, 624 N.Y.S.2d 83, 648 N.E.2d 459, 465 (1995); State v. Zuniga, 336 N.C. 508, 444 S.E.2d 443, 444 (1994); State v. Berry, 80 Ohio St.3d 371, 686 N.E.2d 1097, 1107 (1997); Commonwealth v. Blystone, 555 Pa. 565, 725 A.2d 1197, 1202 (1999); Pailin v. Vose, 603 A.2d 738, 741 (R.I.1992); Gibson v. State, 355 S.C. 429, 586 S.E.2d 119 (2003); Mueller v. Murray, 252 Va. 356, 478 S.E.2d 542, 544 (1996); In re St. Pierre, 118 Wash.2d 321, 823 P.2d 492, 494 (1992); State v. Blake, 197 W.Va. 700, 478 S.E.2d 550, 562 (1996); State v. Lo, 264 Wis.2d 1, 665 N.W.2d 756, 772 (2003); see also Colwell v. State, 118 Nev. 807, 59 P.3d 463, 471 (2002) (adopting Teague for determining the retroactivity of Ring but reserving discretion in its application to state cases); State v. Purnell, 161 N.J. 44, 735 A.2d 513, 521 (1999) (using a Teague analysis for determining the retroactivity of federal constitutional rights).
[29] See, e.g., Ex parte Coker, 575 So.2d 43, 52 (Ala.1990); Pohutski v. City of Allen Park, 465 Mich. 675, 641 N.W.2d 219, 233 (2002); State v. Whitfield, 107 S.W.3d 253, 267 (Mo.2003); Cowell v. Leapley, 458 N.W.2d 514, 518 (S.D.1990); Labrum v. Utah State Bd. of Pardons, 870 P.2d 902, 912 (Utah 1993); Farbotnik v. State, 850 P.2d 594, 602 (Wyo.1993); see also Meadows v. State, 849 S.W.2d 748, 755 (Tenn.1993) (declining to apply Teague to a new state constitutional rule).
[30] See Figarola v. State, 841 So.2d 576, 577 (Fla. 4th DCA 2003); House v. State, 696 So.2d 515, 518 n. 8 (Fla. 4th DCA 1997); Gantorius v. State, 693 So.2d 1040, 1042 n. 2 (Fla. 3d DCA 1997); Logan v. State, 666 So.2d 260, 262 (Fla. 4th DCA 1996); State v. Kamins, 666 So.2d 235, 236 n. 1 (Fla. 4th DCA 1996).
[31] Justice Shaw also mentioned Teague in his separate opinion in Bottoson. 833 So.2d at 711.
[32] See Sepulveda v. United States, 330 F.3d 55, 60 (1st Cir.2003); Coleman v. United States, 329 F.3d 77, 90 (2d Cir.), cert. denied, 540 U.S. 1061, 124 S.Ct. 840, 157 L.Ed.2d 719 (2003); United States v. Swinton, 333 F.3d 481, 491 (3d Cir.), cert. denied, 540 U.S. 977, 124 S.Ct. 458, 157 L.Ed.2d 330 (2003); United States v. Brown, 305 F.3d 304, 309 (5th Cir.2002), cert. denied, 538 U.S. 1007, 123 S.Ct. 1919, 155 L.Ed.2d 840 (2003); Goode v. United States, 305 F.3d 378, 382-85 (6th Cir.), cert. denied, 537 U.S. 1096, 123 S.Ct. 711, 154 L.Ed.2d 647 (2002); United States v. Sanchez-Cervantes, 282 F.3d 664, 671 (9th Cir.), cert. denied, 537 U.S. 939, 123 S.Ct. 48, 154 L.Ed.2d 243 (2002); Curtis v. United States, 294 F.3d 841, 843-44 (7th Cir.), cert. denied, 537 U.S. 976, 123 S.Ct. 451, 154 L.Ed.2d 334 (2002); United States v. Mora, 293 F.3d 1213, 1218-19 (10th Cir.), cert. denied, 537 U.S. 961, 123 S.Ct. 388, 154 L.Ed.2d 315 (2002); United States v. Moss, 252 F.3d 993, 998 (8th Cir.2001), cert. denied, 534 U.S. 1097, 122 S.Ct. 848, 151 L.Ed.2d 725 (2002); McCoy v. United States, 266 F.3d 1245, 1258 (11th Cir.2001), cert. denied, 536 U.S. 906, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002); United States v. Sanders, 247 F.3d 139, 146 (4th Cir.), cert. denied, 534 U.S. 1032, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001); Gisi v. State, 848 So.2d 1278, 1282 (Fla. 2d DCA 2003); Hughes v. State, 826 So.2d 1070, 1074-75 (Fla. 1st DCA 2002), review granted, 837 So.2d 410 (Fla.2003).
[33] The court opined, for example, that Arizona's elected judges are more likely to be influenced by outside influences than juries and that penalty phases "are capable of being extremely truncated affairs with heavy reliance on presentence reports and sentencing memoranda." Summerlin, 341 F.3d at 1110. Thus, the "structure of Arizona capital sentencing allows extra-judicial factors to enter into the ultimate judgment such as the consideration of inadmissible evidence, political pressure, truncated evidentiary presentation, and prior experience with other capital defendants that would be absent from a jury's consideration of penalty-phase evidence." Id. at 1115.
[34] Relying on Neder, the courts of appeals have uniformly rejected the argument that Apprendi errors are "structural" and have applied harmless-error analysis to Apprendi claims. See, e.g., Coleman, 329 F.3d at 89-90; Sanchez-Cervantes, 282 F.3d at 670; United States v. Candelario, 240 F.3d 1300, 1307 (11th Cir.), cert. denied, 533 U.S. 922, 121 S.Ct. 2535, 150 L.Ed.2d 705 (2001); United States v. Nance, 236 F.3d 820, 825-26 (7th Cir.2000), cert. denied, 534 U.S. 832, 122 S.Ct. 79, 151 L.Ed.2d 43 (2001).
[35] See Florida Department of Corrections, Death Row Fact Sheet, available at http://w ww.dc.state.fl.us/oth/deathrow/index.html # Statistics.
[36] In Whitfield, the Missouri Supreme Court applied the Linkletter retroactivity test to Ring and held the case warranted retroactive application. Acknowledging that the purpose to be served by the rule was an insufficient basis alone to require this result, the court found that the second and third factors "clearly favor[ed] retroactivity," concluding that because Missouri's capital sentencing statute differs significantly from that of other states, the extent of reliance on the former rule and the effect on the administration of justice was extremely limited. 107 S.W.3d at 268-69. For example, the court had only identified five potential cases that would be affected. Id. at 269. That is obviously not the case in Florida.
[37] See Florida Department of Corrections, Death Row Fact Sheet, available at http://w ww.dc.state.fl.us/activeinmates/deathrowroster.asp.