# Third District Court of Appeal

## State of Florida

Opinion filed January 31, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-536
Lower Tribunal No. 03-26562A
_____

**Derek Lorenzo Johnson,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Miguel M. de la O, Judge.

Carlos J. Martinez, Public Defender, and Billie Jan Goldstein, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Keri T. Joseph, Assistant Attorney General, for appellee.

Before ROTHENBERG, C.J., and SUAREZ and LUCK, JJ.

ROTHENBERG, C.J.

Derek Lorenzo Johnson ("the defendant") was convicted of attempted second degree murder on August 25, 2004. After his conviction and sentence were affirmed on appeal, see Johnson v. State, 930 So. 2d 668 (Fla. 3d DCA 2006), the defendant filed: (1) a petition for a writ of certiorari with the United States Supreme Court, which was denied in Johnson v. Florida, 549 U.S. 1121 (2007); (2) a pro se motion to vacate, set aside, or correct the judgment and sentence; (3) a petition for writ of habeas corpus with this Court, requesting that his sentence be vacated and remanded for resentencing, which was denied in Johnson v. State, 990 So. 2d 1075 (Fla. 3d DCA 2008); (4) a pro se motion to correct an illegal sentence, which was denied by the trial court and affirmed by this Court in Johnson v. State, 11 So. 3d 957 (Fla. 3d DCA 2009); and (5) a verified amended motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The trial court consolidated the defendant's pro se motion to vacate, set aside, or correct the judgment and sentence with his subsequently filed motion for postconviction relief, and after conducting an evidentiary hearing, issued a lengthy well-written order denying the defendant's motions. The order includes a very thorough analysis and recitation of the evidence relied upon by the trial court in reaching its conclusions.

Although the consolidated motions raised several grounds, on appeal the defendant raises only one ground for reversal—that trial counsel "effectively

2

deprived Mr. Johnson of the ability to make a knowing and voluntary decision about testifying." This claim, however, was not raised below in either of the motions filed by the defendant and was not litigated by the parties. What the defendant argued below was that his trial counsel provided ineffective assistance of counsel by advising the defendant not to testify at his trial and misadvising the defendant that if he testified, the details of his prior convictions could potentially be disclosed to the jury. However, because the record reflects that the voluntariness of the defendant's decision not to testify was indirectly raised during the evidentiary hearing, and the State has, in the abundance of caution, addressed the merits of this claim in its answer brief, we too will address the merits of this unpreserved claim, but only within the narrow confines of the evidence and arguments offered below.

## THE EVIDENCE

The defendant claims that he wanted to testify at his trial in order to refute the testimony of the victim, Timothy Davis, who is also the defendant's half-brother. Davis was shot in the head twice while sitting with the defendant in the front seat of the defendant's car by a man known as "Black Boy," who was sitting directly behind Davis in the back seat of the defendant's car.

According to Davis, the defendant was a drug dealer. Davis testified that he wanted to purchase two kilograms of cocaine. He, therefore, contacted the

3

defendant, who arranged to purchase the cocaine from Ramses Hankerson, who is also known as Moochie, in Miami. Davis, who lived in Virginia, drove to Tampa, Florida, to meet with the defendant, and together, they drove in the defendant's car to Miami. In exchange for his services, the defendant was to receive a $2,000 fee from Davis.

After arriving in Miami, the defendant and Davis met with Moochie. Moochie brought a sample of the cocaine for Davis and the defendant to inspect. After the inspection, Moochie delivered approximately one kilogram, or one-half of the two-kilogram purchase, to the defendant and Davis in the defendant's car in exchange for the $40,000 in cash Davis had brought for the purchase, with the promise that he would retrieve the remainder of the cocaine from a nearby apartment and bring it down to the defendant's car. Moochie, however, fled with the $40,000 and did not deliver the remainder of the cocaine. After attempts to locate Moochie were unsuccessful, Davis called a friend who knew Moochie to complain about the theft of his money, and several phone calls were made in an attempt to get Moochie to return Davis's money or to deliver the remainder of the cocaine purchased.

Davis testified that after these calls were made, the defendant began "acting strange." The defendant called someone on his cell phone, and although Davis wanted to leave Miami, the defendant drove to the defendant's girlfriend's

4

apartment, met briefly with his girlfriend, used the restroom, and then drove back to the area where they had originally met with Moochie. When they arrived at that location, the defendant exited his car and met with two unknown men on the street. Although Davis could not hear their conversation, he did hear one of the men tell the defendant: "No, no, no, man; no man. That is your people . . . ." Davis testified that this same man then looked into the defendant's car and said, "no, no, I ain't got nothing to do with that there," and then the man walked away. Davis testified that the second man who was speaking with the defendant pulled the hood of his hoodie over his head and got into the backseat of the car behind Davis, who was in the front passenger seat. The defendant identified the man in the hoodie as his "cousin." Davis, who was the defendant's half-brother, testified that he had never met the man the defendant claimed was his cousin.

Davis testified that after the three men drove around for a while, and made a brief stop, Davis, who had already noticed that the defendant was acting strangely, became suspicious and increasingly nervous and called his girlfriend to tell her that he loved her. While Davis was speaking to his girlfriend, he saw the defendant pound the steering wheel of the car and heard the defendant say: "God damn man, what you gonna do?" Immediately thereafter, the man in the hoodie, who the defendant had identified as his "cousin," shot Davis in the back of the head. Blood started coming out of Davis's ears and mouth. Davis fell forward, dropping his

5

telephone, pushed himself up, and then looked at the defendant, who looked back at him with an expression on his face, which Davis described as, "Like he ain't dead yet?" As Davis was trying to reach for the door handle, he was shot in the head again. Davis then heard the defendant tell his "cousin" to get Davis out of his car because "he is bleeding all over my shit," which Davis explained meant the defendant's car.

Thereafter, the defendant and the defendant's "cousin" dumped Davis in a ditch on the side of a road. When the defendant's "cousin" considered shooting Davis again, Davis pretended to be dead, and the defendant told his "cousin," "No, no, no, no, no. He is dead. He is dead. Come on, let's go, let's go," and they left. Davis was able to make it to a nearby house, knock on the door, and ask for help. He was rushed to the hospital, where he underwent surgery and survived.

The State also introduced evidence that after the shooting, the defendant had the blood-stained carpeting and seatbelt removed from his car, and he had the vehicle cleaned and painted. The person who worked on the car called the police and the defendant was arrested. Davis's and the State's position at trial was that the defendant was involved in the "rip-off" of Davis's money and that the defendant either procured his "cousin" to shoot and kill Davis or that the defendant willingly assisted in the attempted murder of Davis.

At trial, the defendant did not dispute the evidence regarding the drug transaction or the "rip-off" by Moochie. His defense was that he had no knowledge of, nor participation in, the attempted murder of Davis. In support of his defense, the defendant called Moochie as a defense witness. Moochie confirmed the evidence regarding the events surrounding the drug transaction and his theft of Davis's money, but testified that the defendant did not know that Moochie intended to steal Davis's money. Moochie disavowed any involvement with the shooting and denied having knowledge of the shooter's identity. The defendant did not call any other witnesses, and he did not testify at the trial.

**ANALYSIS**

A. **The advice of counsel**

The defendant claimed below that his trial counsel provided ineffective assistance of counsel by advising him not to testify on his own behalf. Based on the evidence at the evidentiary hearing, which clearly reflects that trial counsel's advice to the defendant that he not testify was a strategic one, the case law, and the trial court's factual and credibility determinations, appellate counsel appears to have properly abandoned this argument on appeal.

As the trial court noted, a strategic or tactical decision, which in this case was whether the defendant should testify in his own defense, is not a valid basis for an ineffective assistance of counsel claim unless the defendant is able to show that

7

no competent trial counsel would have utilized the tactics employed.  Windom v. State, 886 So. 2d 915, 922-23 (Fla. 2004); see also Strickland v. Washington, 466 U.S. 668, 689 (1984) (holding that the defendant must overcome the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance, and that, under the circumstances, the challenged action might be considered sound trial strategy).

The defendant's trial counsel testified at the evidentiary hearing that he strongly advised the defendant against testifying.  This advice, which he conveyed to the defendant when they discussed whether the defendant should take the stand in his defense during the trial, was based on his belief that: (1) the trial was going well, and that the defendant's testimony and the cross-examination from the very experienced and effective prosecutor trying the case would hurt, not help the defendant; (2) the jury would learn that the defendant was a convicted felon with six prior felony convictions; and (3) the defendant would not be a good witness.

"[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).  Because the defendant's trial counsel's strategic decision to advise the defendant not to testify was not unreasonable, we conclude

that the trial court did not err by denying the defendant's ineffective assistance of counsel claim on this basis.

B. **<u>The voluntariness of the defendant's decision not to testify</u>**

The only issue actually raised in this appeal is whether the defendant's decision not to testify at his trial was freely and voluntarily made. The argument made below as to the voluntariness of the defendant's decision not to testify was premised on the forcefulness of trial counsel's advice to the defendant and trial counsel's demeanor in conveying that advice. Although the trial court found that the discussion between the defendant and his trial counsel about whether the defendant should testify was "heated and intense, and [trial counsel] made his opinion known loudly and strongly to [the defendant]," the trial court nevertheless found that the defendant's decision not to testify was voluntarily made. This finding is supported by the record.

The record reflects that the defendant was thoroughly questioned by the trial court about his decision not to testify prior to submitting the case to the jury. The trial court specifically advised the defendant that despite whatever advice trial counsel may have given him about testifying, the decision was the defendant's to make. The defendant stated that he understood that the decision was his to make, but he had decided not to testify, and he had made that decision freely and voluntarily:

THE COURT: Mr. Johnson, it is my understanding that since [trial counsel] has just rested the case in front of the jury that you do not wish to be a witness on your own behalf; is this correct?

THE DEFENDANT: Yes, sir.

THE COURT: Now while you have an excellent lawyer, [], and he may have given you advice on whether you should or should not [testify] but the ultimate advice about whether you testify is your decision, do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Are you making a decision not to be a witness on your own behalf freely and voluntarily?

THE DEFENDANT: Yes, sir.

The trial court even took a recess to allow the defendant to speak with his trial counsel privately in the jury room to address any questions or concerns he may have had, and after that recess, the trial court re-affirmed with the defendant that he did not wish to testify and that his decision not to testify was freely and voluntarily made:

THE COURT: Okay, Mr. Johnson, I have now had you go back with [trial counsel] to ask any other questions that you may have. Are you satisfied with any discussion that you have reached back there?

THE DEFENDANT: Yes, sir.

THE COURT: You are still under the opinion that you do not wish to be a witness; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: This is of your own free will? No matter what was said back there, this is your choice?

THE DEFENDANT: Yes, sir.

THE COURT: Court finds that [Mr.] Johnson is alert and intelligent, and does understand his right to waive his right to testify. The defendant is fully informed of it and is doing it freely and voluntarily and that all witnesses and defenses have been put on and so forth. Thank you, Mr. Johnson.

THE DEFENDANT: You are welcome, sir.

We, therefore, find that the trial court's finding that the defendant's decision not to testify was freely and voluntarily made is supported by the record.

The defendant, however, claims on appeal that trial counsel's failure to prepare the defendant for cross-examination in the event he did testify and failure to discuss the possibility of the defendant testifying prior to trial in a calmer setting to allow the defendant to "calmly consider his options" resulted in a decision that was not voluntary. Because these claims were not raised or litigated below, they were not preserved for appellate review, and thus, we decline to address them on appeal.

Affirmed.

11